UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| Ron Ramsay and Peter Vandervort;<br>Celeste and Amber Carlson Allebach;<br>Brock Dahl and Austin Lang; Michelle<br>Harmon and Joy Haarstick; Bernie<br>Erickson and David Hamilton; Matthew<br>Lee Elmore and Beau Thomas Downey;<br>and Stephanie and Siana Bock, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **Case No. 3:14-CV-57** |
| Jack Dalrymple, in his official capacity<br>as Governor; Wayne Stenehjem, in his<br>official capacity as Attorney General;<br>Ryan Rauschenberger, in his official<br>capacity as State Tax Commissioner;<br>Terry Dwelle, in his official capacity as<br>State Health Officer; and Charlotte<br>Sandvik, in her official capacity as Cass<br>County Treasurer, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

......................................................................................................................................................

_____

**MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**
_____

State of North Dakota
Wayne Stenehjem
Attorney General

By:     Douglas A. Bahr
        Solicitor General
        State Bar ID No. 04940
        Office of Attorney General
        500 North 9th Street
        Bismarck, ND 58501-4509
        Telephone (701) 328-3640
        Facsimile (701) 328-4300

Attorneys for Defendants Jack Dalrymple, in
his official capacity as Governor, Wayne
Stenehjem, in his official capacity as Attorney
General, Ryan Rauschenberger, in his official
capacity as Tax Commissioner, and Terry
Dwelle, in his official capacity as State Health
Officer.

## TABLE OF CONTENTS AND AUTHORITIES

**Page(s)**

Statement of the Case ..............................................................................1

N.D. Const. art. XI, § 28 .........................................................................1

N.D.C.C. § 14-03-01 ..............................................................................1

N.D.C.C. § 14-03-08 ..............................................................................1

Arguments ...............................................................................................1

I.      No "material" facts are in dispute ...............................................1

II.     This case involves two conflicting marriage institutions that cannot co-exist ............2

United States v. Windsor,
        133 S. Ct. 2675 (2013) ..........................................................3

N.D.C.C. § 14-03-01 ..............................................................................4

N.D.C.C. § 14-03-08 ..............................................................................4

N.D. Const. art. XI, § 28 .........................................................................4

III.    The States have the power to define marriage .............................4

Ex parte Burrus,
        136 U.S. 586 (1890) ..............................................................4

Simms v. Simms,
        175 U.S. 162 (1899) ..............................................................4

United States v. Windsor,
        133 S. Ct. 2675 (2013) ..........................................................4

Rose v. Rose,
        481 U.S. 619 (1987) ..............................................................4

Haddock v. Haddock,
        201 U.S. 562 (1906), overruled on other grounds,
        Williams v. North Carolina,
        317 U.S. 287 (1942)...............................................................4

Sosna v. Iowa,
        419 U.S. 393 (1975) ..............................................................4

IV.     North Dakota marriage law does not violate either the
        Due Process Clause or the Equal Protection Clause of
        the Fourteenth Amendment ......................................................4

A.      *Baker v. Nelson* and *Citizens for Equal*
        *Protection v. Bruning* are binding precedent ..................................4

Baker v. Nelson,
        409 U.S. 810 (1972)................................................................ 4

Citizens for Equal Protection v. Bruning,
        455 F.3d 859 (8ᵗʰ Cir. 2006) ................................................ 4

        1.      *Baker* is controlling ................................................................4

        Baker v. Nelson,
                409 U.S. 810 (1972) ................................................ 4, 6-9

        Baker v. Nelson,
                191 N.W.2d 185 (Minn. 1971) ....................................... 5-6

        Hicks v. Miranda,
                422 U.S. 332 (1975) .......................................................5

        Doe v. Hodgson,
                478 F.2d 537 (2d Cir. 1973) ...........................................5

        Mandel v. Bradley,
                432 U.S. 173 (1977) .......................................................5

        Baker v. Nelson,
                Jurisdictional Stmt., No. 71-1027 (Feb. 11, 1971) ..........................5

        Tigner v. Texas,
                310 U.S. 141 (1940) .......................................................6

        Loving v. Virginia,
                388 U.S. 1 (1967) ..........................................................6

        Rodriquez de Quijas v. Shearson/Am. Express, Inc.,
                490 U.S. 477 (1989) .......................................................6

        Frontiero v. Richardson,
                411 U.S. 677 (1973) .......................................................6

        Romer v. Evans,
                517 U.S. 620 (1996) .......................................................7

        Lawrence v. Texas,
                539 U.S. 558 (2003) .................................................. 7, 8

        United States v. Windsor,
                133 S. Ct. 2675 (2013) ................................................ 7-8

        Windsor v. United States,
                699 F.3d 169 (2d Cir. 2012), aff'd,
                133 S. Ct. 2675 (2013) ...................................................7

Williams v. North Carolina,
    317 U.S. 287 (1942) ................................................................ 8

Sosna v. Iowa,
    419 U.S. 393 (1975) ................................................................ 8

Herbert v. Kitchen,
    134 S. Ct. 893 (2014) .............................................................. 8

Kitchen v. Herbert,
    No. 2:13-cv-217, 2013 WL 6834634 (D.
    Utah Dec. 23, 2013) ................................................................ 9

Kitchen v. Herbert,
    No. 13-4178, 2014 WL 2868044 (10th
    Cir. Dec. 24, 2013) ................................................................. 9

Hollingsworth v. Perry,
    558 U.S. 183 (2010) ................................................................ 9

2.    *Bruning is controlling* ............................................................ 9

Citizens for Equal Protection v. Bruning,
    455 F.3d 859 (8th Cir. 2006) ........................................... 9-10

United States v. Windsor,
    133 S. Ct. 2675 (2013) ..................................................... 9, 10

Gallagher v. City of Clayton,
    699 F.3d 1013 (8th Cir. 2012) ............................................ 10

Executive Air Taxi Corp. v. City of Bismarck,
    518 F.3d 562 (8th Cir. 2008) .............................................. 10

B.    There is no fundamental right to marry someone
    of the same sex .................................................................... 10

Collins v. City of Harker Heights,
    503 U.S. 115 (1992) ........................................................ 10-11

Washington v. Glucksberg,
    521 U.S. 702 (1997) ........................................................ 11-12

United States v. Windsor,
    133 S. Ct. 2675 (2013) .................................................... 11-12

Lawrence v. Texas,
    539 U.S. 558 (2003) .............................................................. 11

C.    North Dakota marriage law does not violate
    equal protection .................................................................... 12

    1.    *The standard of review is rational basis* ............................ 12

Citizens for Equal Protection v. Bruning,
    455 F.3d 859 (8th Cir. 2006)............................................................ 12

Baker v. Nelson,
    409 U.S. 810 (1972) ...................................................................... 12

United States v. Windsor,
    133 S. Ct. 2675 (2013) ............................................................... 12-13

Adarand Constructors, Inc. v. Pena,
    515 U.S. 200 (1995) ...................................................................... 13

Craig v. Boren,
    429 U.S. 190 (1976) ...................................................................... 13

        a.    Alleged "animus" does not change
                the standard of review.............................................. 13

        City of Renton v. Playtime Theatres, Inc.,
            475 U.S. 41 (1986) ............................................................. 13-14

        Romer v. Evans,
            517 U.S. 620 (1996) ........................................................... 13-14

        United States v. Windsor,
            133 S. Ct. 2675 (2013) ....................................................... 13-14

        Bd. of Tr. of the Univ. of Alabama v. Garrett,
            531 U.S. 356 (2001) .............................................................. 14

        United States v. O'Brien,
            391 U.S. 367 (1968) .............................................................. 14

        City of Mobile v. Bolden,
            446 U.S. 55 (1980) .............................................................. 14

        b.    North Dakota marriage laws are
                based on legitimate state
                interests, not animus................................................ 15

        United States v. Windsor,
            133 S. Ct. 2675 (2013) ...................................... 15-16, 19-20

        Lawrence v. Texas,
            539 U.S. 558 (2003) .............................................................. 15

        Hernandez v. Robles,
            855 N.E.2d 1 (N.Y. 2006) ...................................................... 15

        Standhardt v. Superior Court,
            77 P.3d 451 (Ariz. Ct. App. 2003)....................................... 15

        In re Marriage of J.B. & H.B.,
            326 S.W.3d 654 (Tex. Ct. App. 2010) ................................ 16

N.D. Const. art. XI, § 28 ........................................................ 16, 19

N.D.C.C. § 14-03-01 ............................................................. 16

N.D.C.C. § 14-03-08 ............................................................. 16

Palmer v. Thompson,
     403 U.S. 217 (1971) ...................................................... 16-17

United States v. O'Brien,
     391 U.S. 367 (1968) .......................................................... 17

Edwards v. Aguillard,
     482 U.S. 578 (1987) .......................................................... 17

Minutes of Senate Standing Comm. on S.B.
     2230 (Feb. 5, 1997) ....................................................... 17, 18

Hearing before the Senate Judiciary Comm. on
     S.B. 2230 (written testimony of Sally M.
     Sandvig, Representative) (Feb. 5, 1997) ........................... 18

Minutes of House Standing Comm. on S.B.
     2230 (Mar. 11, 1997) ......................................................... 18

Hearing before the Senate Judiciary Comm. on
     S.B. 2230 (written testimony of
     Christopher T. Dodson, Executive Dir.)
     (Feb. 5, 1997) ................................................................... 18

Kardules v. City of Columbus,
     95 F.3d 1335 (6th Cir. 1996) ............................................. 19

City of Mobile v. Bolden,
     446 U.S. 55 (1980) ............................................................ 19

Sosna v. Iowa,
     419 U.S. 393 (1975) .......................................................... 21

c.     North Dakota's marriage laws do
     not discriminate based on gender ...................................... 21

Loving v. Virginia,
     388 U.S. 1 (1967) ............................................................. 21

Baker v. State,
     744 A.2d 864 (Vt. 1999) .................................................... 21

Sevcik v. Sandavol,
     911 F. Supp. 2d 996 (D. Nev. 2012) .................................. 21

Jackson v. Abercrombie,
     884 F. Supp. 2d 1065 (D. Hawaii 2012) ............................ 21

N.D.C.C. ch. 14-03 ........................................................................ 22

2.    *The challenged constitutional provision
      and laws are rational and serve
      legitimate, compelling public interests* ................................. 22

Arkansas State Highway Emp. Local 1315 v. Kell,
      628 F.2d 1099 (8th Cir. 1980) ....................................... 22

Vance v. Bradley,
      440 U.S. 93 (1979) ........................................................ 22

Hawkeye Commodity Promotions, Inc. v. Vilsack,
      486 F.3d 430 (8th Cir. 2007) ........................................ 22

Nordlinger v. Hahn,
      505 U.S. 1 (1992) .......................................................... 22

F.C.C. v. Beach Commc'ns, Inc.,
      508 U.S. 307 (1993) ...................................................... 23

United States v. Windsor,
      133 S. Ct. 2675 (2013) ........................................... 23, 25

Adoptive Couple v. Baby Girl,
      133 S. Ct. 2552 (2013) .................................................. 23

Gonzales v. Carhart,
      550 U.S. 124 (2007) ...................................................... 23

Bowen v. Gilliard,
      483 U.S. 587 (1987) ...................................................... 23

Skinner v. Oklahoma,
      316 U.S. 535 (1942) ...................................................... 23

Murphy v. Ramsey,
      114 U.S. 15 (1885) ........................................................ 23

Santosky v. Kramer,
      455 U.S. 745 (1982) ...................................................... 24

Parham v. J.R.,
      442 U.S. 584 (1979) ...................................................... 24

Hernandez v. Robles,
      855 N.E.2d 1 (N.Y. 2006) ............................................. 24

Conaway v. Deane,
      932 A.2d 571 (Md. 2007) .............................................. 24

Douglas W. Allen, High School Graduation Rates Among Children of Same-Sex Households, 11 Rev. Econ. Household 635 (2013) ........................................................ 24

Mark Regnerus, How Different Are the Adult Children of Parents Who Have Same-Sex Relationships? Findings from the New Family Structures Study, 41 Soc. Sci. Res. 752 (2012) ..................................................................... 24

Mark Regnerus, Parental Same-Sex Relationships, Family Instability, and Subsequent Life Outcomes for Adult Children: Answering Critics of the New Family Structures Study with Additional Analysis, 41 Soc. Sci. Res. 1367 (2012) ..................................................................... 24

The Witherspoon Institute, Marriage and the Public Good: Ten Principles (2008)................................................... 24

David Popenoe, Life Without Father: Compelling New Evidence That Fatherhood & Marriage are Indispensable for the Good of Children & Society (1996) ...................... 24

Douglas W. Allen, High School Graduation Rates Among Children of Same-Sex Households, 11 Rev. Econ. Household 635 (2013) ........................................................ 24

Loren Marks, Same-Sex Parenting and Children's Outcomes: A Closer Examination of the American Psychological Association's Brief on Lesbian and Gay Parenting, 41 Soc. Sci. Res. 735 (2012).......................... 24

3.     The classification in the challenged laws
       is permissible ........................................................ 25

Citizens for Equal Protection v. Bruning,
       455 F.3d 859 (8th Cir. 2006) ........................... 25

Heller v. Doe,
       509 U.S. 312 (1993).............................................. 25, 27

Armour v. City of Indianapolis,
       132 S. Ct. 2073 (2012).................................... 26

Johnson v. Robison,
       415 U.S. 361 (1974)........................................ 26, 27

Jackson v. Abercrombie,
       884 F. Supp. 2d 1065 (D. Hawaii 2012) ......................... 26

Andersen v. King Cnty.,
       138 P.3d 963 (Wash. 2006) .................................. 26, 27

Morrison v. Sadler,
       821 N.E.2d 15 (Ind. Ct. App. 2005)............................. 26

Standhardt v. Superior Court,
    77 P.3d 451 (Ariz. Ct. App. 2003) ................................................. 27

Vance v. Bradley,
    440 U.S. 93 (1979) ......................................................................... 27

Nguyen v. INS,
    533 U.S. 53 (2001) ......................................................................... 27

Griswold v. Connecticut,
    381 U.S. 479 (1965) ....................................................................... 28

N.D. Const. art. XI, § 28 ......................................................................... 29

N.D.C.C. § 14-03-01 ............................................................................... 29

N.D.C.C. § 14-03-08 ............................................................................... 29

4.     *Redefining marriage as genderless would*
       *be contrary to the public interests*
       *promoted by traditional marriage* ........................................ 29

Monte Neil Stewart, Marriage Facts, 31 Harv.
J.L. & Pub. Pol'y 313 (2008) ................................................................. 29

Sherif Girgis et al., What is Marriage? Man and
Woman: A Defense (2011) ...................................................................... 29

The Witherspoon Institute, Marriage and the
Public Good: Ten Principles (2008) ........................................................ 29

Joseph Raz, The Morality Of Freedom (1986) ........................................ 30

Hernandez v. Robles,
    805 N.Y.S.2d 354 (N.Y. App. Div. 2005), aff'd,
    855 N.E.2d 1 (N.Y. 2006) .............................................................. 30

Bertrand Russell, Marriage & Morals (Liveright 1970) ........................... 30

Lewis v. Harris,
    908 A.2d 196 (N.J. 2006) .............................................................. 31

United States v. Windsor,
    133 S. Ct. 2675 (2013) .................................................................. 31

Institute for American Values, Marriage and the Law:
A Statement of Principles (2006) ........................................................... 31

5.     *The challenged laws satisfy heightened*
       *scrutiny* ................................................................................. 32

Rostker v. Goldberg,
   453 U.S. 57 (1981) ............................................................. 32

Nguyen v. INS,
   533 U.S. 53 (2001) ............................................................. 32

Michael M. v. Superior Court,
   450 U.S. 464 (1981) ........................................................... 32

Maher v. Roe,
   432 U.S. 464 (1977) ........................................................... 32

Turner Broad. Sys., Inc. v. FCC,
   520 U.S. 180 (1997) ........................................................... 33

Grutter v. Bollinger,
   539 U.S. 306 (2003) ........................................................... 33

Turner Broad. Sys., Inc. v. FCC,
   512 U.S. 622 (1994) ........................................................... 33

Joseph Raz, Ethics in the Public domain (1994) ...................... 33

   6.    *Plaintiffs are not entitled to summary
         judgment* ............................................................... 33

V.    Federal constitutional law does not require North
      Dakota to recognize same-sex marriages performed in
      other states ...................................................................... 34

Nevada v. Hall,
   440 U.S. 410 (1979) ........................................................... 34

Pac. Emp'rs Ins. Co. v. Indus. Accident Comm'n,
   306 U.S. 493 (1939) ........................................................... 34

Franchise Tax Bd. of California v. Hyatt,
   538 U.S. 488 (2003) ........................................................... 34

Sun Oil Co. v. Wortman,
   486 U.S. 717 (1988) ........................................................... 34

United States v. Windsor,
   133 S. Ct. 2675 (2013) .................................................. 34-35

VI.   If the Court grants Plaintiff's motion, it should stay its
      ruling pending appeal ....................................................... 35

Herbert v. Kitchen,
   134 S. Ct. 893 (2014) ......................................................... 35

McQuigg v. Bostic,
   No. 14A196, 2014 WL 4096232 (Aug. 20, 2014) ................. 35

Latta v. Otter,
    No. 14-35420 (9th Cir. May 20, 2014) .............................................................. 35

Patrick J. Borchers, Baker v. General Motors: Implications
for Interjurisdictional Recognition of Non-Traditional
Marriages, 32 Creighton L. Rev. 147 (1998) ................................................. 35

Iowa Utilities Bd. v. F.C.C.,
    109 F.3d 418 (8th Cir. 1996) .......................................................................... 36

Population Inst. v. McPherson,
    797 F.2d 1062 (D.C. Cir. 1986) ...................................................................... 36

Coal. for Econ. Equity v. Wilson,
    122 F.3d 718 (9th Cir. 1997) .......................................................................... 36

Evans v. Utah,
    No. 2:14CV55DAK, 2014 WL 2048343 (D. Utah May 19, 2014) ...................... 36

Conclusion ............................................................................................................ 37

**STATEMENT OF THE CASE**

Plaintiffs challenge the constitutionality of N.D. Const. art. XI, § 28, N.D.C.C. §§ 14-03-01 and 14-03-08, and any other North Dakota law limiting marriage to a legal union between a man and a woman. See Doc. 19 ¶¶ 5, 10, 122, 135, 144, 155, p. 48 (A), (B). Defendants Governor Jack Dalrymple, Attorney General Wayne Stenehjem, Tax Commissioner Ryan Rauschenberger, and State Health Officer Terry Dwelle, in their official capacities (collectively "State Defendants"), moved to dismiss Plaintiffs' First Amended Complaint for Permanent Injunction and Declaratory Relief (Complaint). Doc. 28. Plaintiffs subsequently filed a motion for summary judgment and memorandum in support of their motion and opposing State Defendants' Motion to Dismiss. Docs. 41, 42. State Defendants file this memorandum in opposition to Plaintiffs' Motion for Summary Judgment.

**ARGUMENTS**

**I.      No "material" facts are in dispute.**

Many facts are alleged in the Complaint and Declarations about the lives of the Plaintiffs, how they met, and how they subjectively feel. These are not insignificant facts viewed on a personal level. They are not, however, facts legally material to resolving the issues before the Court.[1]

State Defendants do not dispute that legal benefits, burdens, and restrictions accompany the institution of formal marriage. State Defendants also do not dispute that the legal benefits, burdens, and restrictions that accompany marriage are not received by or imposed on same-sex couples under North Dakota law.

Although State Defendants agree there are no "material" facts in dispute, State Defendants dispute Plaintiffs' legal conclusions presented as facts. For example, State Defendants dispute Plaintiffs' legal conclusion that certain Plaintiffs "are similarly

---

[1] State Defendants do not dispute that Plaintiffs have standing to bring their claims, i.e., that Plaintiffs are same-sex couples who wish to marry in North Dakota or wish to have their out-of–state marriages recognized by North Dakota.

situated in all relevant respects to different–sex couples who wish to marry in [North Dakota]." Doc. 41 at 14. State Defendants also dispute Plaintiffs' legal conclusion that certain Plaintiffs "are similarly situated in all relevant respects to different–sex couples whose validly contracted out-of-state marriages are recognized in North Dakota." Id. In fact, as explained below, it is the difference between different–sex couples and same–sex couples that justify the challenged laws, whether reviewed under the rational basis standard or heightened scrutiny.

## II. This case involves two conflicting marriage institutions that cannot co-exist.

This case involves two mutually exclusive and profoundly different marriage institutions, marriage institutions that serve separate, distinct, and conflicting societal purposes.

Nearly all human societies have had a social institution of marriage constituted by the core public meaning of "the union of a man and a woman." See Doc. 37 at 39-40. The man-woman marriage institution has uniquely provided valuable social benefits necessary to the well-being and stability of society and the development of individuals, especially children. In particular, the man-woman marriage institution's norms and other public meanings have helped a greater portion of children know and be raised by their mother and father.

Toward the end of the twentieth century, however, various individuals and groups began a campaign to use the force of law to replace the man-woman marriage (traditional marriage) institution with an institution that would still be called "marriage" but would have a very different core meaning: the union of any two persons without regard to gender (genderless marriage). This civil action is an important part of that campaign.

Justice Alito succinctly explained these two competing marriage institutions in United States v. Windsor, 133 S. Ct. 2675 (2013).  Without any disagreement from the other justices, Justice Alito observed that the parties there were:

> really seeking to have the Court resolve a debate between two competing views of marriage.
>
> The first and older view, which I will call the "traditional" or "conjugal" view, sees marriage as an intrinsically opposite-sex institution [because, some assert] . . . the institution of marriage was created for the purpose of channeling heterosexual intercourse into a structure that supports child rearing.  Others explain the basis for the institution in more philosophical terms.  They argue that marriage is essentially the solemnizing of a comprehensive, exclusive, permanent union that is intrinsically ordered to producing new life, even if it does not always do so.  While modern cultural changes have weakened the link between marriage and procreation in the popular mind, there is no doubt that, throughout human history and across many cultures, marriage has been viewed as an exclusively opposite-sex institution and as one inextricably linked to procreation and biological kinship.
>
> The other, newer view is what I will call the "consent-based" vision of marriage, a vision that primarily defines marriage as the solemnization of mutual commitment—marked by strong emotional attachment and sexual attraction—between two persons.

Id. at 2718 (Alito, J. dissenting) (citations omitted).

Justice Alito then observed that genderless marriage partakes fully of the ethos of the adult-centric close personal relationship model of marriage and that, indeed, the legal arguments in favor of genderless marriage are necessarily built on the foundation of that model.   Id.   Thus, because it is decidedly more adult-centric, genderless marriage differs profoundly from the more child-centric traditional model of marriage.  As noted by Justice Alito, legislatures "have little choice but to decide between the two views."  Id. at 2719.

North Dakota can have only one social institution denominated "marriage."  It cannot simultaneously provide the historically proven valuable social benefits of man-woman marriage and the asserted benefits of the new genderless marriage.  One necessarily displaces or precludes the other.

As is their constitutional right, the People of North Dakota resolved the social contest between the two mutually exclusive marriage institutions by, through their elected legislatures, adopting N.D.C.C. §§ 14-03-01 and 14-03-08 and, through an overwhelming vote of the People, adopting N.D. Const. art. XI, § 28.[2]

### III.    The States have the power to define marriage.[3]

In cases spanning three centuries, the Supreme Court has emphasized that "[t]he whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states, and not to the laws of the United States."  Ex parte Burrus, 136 U.S. 586, 593–94 (1890); Simms v. Simms, 175 U.S. 162, 167 (1899); Rose v. Rose, 481 U.S. 619, 625 (1987); Windsor, 133 S. Ct. at 2691-92.  The States' power to define marriage flows from the fact that "the states, at the time of the adoption of the Constitution, possessed full power over the subject of marriage and divorce . . . [and] the Constitution delegated no authority to the government of the United States on the subject of marriage and divorce."  Haddock v. Haddock, 201 U.S. 562, 575 (1906), overruled on other grounds, Williams v. North Carolina, 317 U.S. 287 (1942).  Thus, marriage and domestic relations is "an area that has long been regarded as a virtually exclusive province of the States."  Sosna v. Iowa, 419 U.S. 393, 404 (1975).

### IV.    North Dakota marriage law does not violate either the Due Process Clause or the Equal Protection Clause of the Fourteenth Amendment.

A.    *Baker v. Nelson* and *Citizens for Equal Protection v. Bruning* are binding precedent.

1.    *Baker* is controlling.[4]

In Baker v. Nelson, 409 U.S. 810 (1972), the Supreme Court summarily dismissed, "for want of a substantial federal question," 409 U.S. at 810, an appeal by two men whom

---

[2] The People of North Dakota voted overwhelmingly (73%) in favor of a proposed state constitutional amendment.  See Doc. 44-11 at 2.
[3] The States power to define marriage is discussed at Doc. 37 at 14-19 and incorporated by reference herein.
[4] The binding effect of Baker is discussed at Doc. 37 at 22-24 and incorporated by reference herein.

the State of Minnesota denied a marriage license "on the sole ground that petitioners were of the same sex." Baker v. Nelson, 191 N.W.2d 185, 185 (Minn. 1971). That summary dismissal was a decision on the merits by which "lower courts are bound . . . 'until such time as the Court informs (them) that (they) are not.'" Hicks v. Miranda, 422 U.S. 332, 344–45 (1975) (quoting Doe v. Hodgson, 478 F.2d 537, 539 (2d Cir. 1973)). The summary dismissal "without doubt reject[ed] the specific challenges presented in the statement of jurisdiction," left "undisturbed the judgment appealed form," and "prevent[s] lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions." Mandel v. Bradley, 432 U.S. 173, 176 (1977) (per curiam).

Baker presented the "precise issues" raised in this case, with the exception of Plaintiffs' right to travel claim. See Baker, 191 N.W.2d. at 186. The Baker plaintiffs specifically claimed that the State's denial of a marriage license "deprive[d] [them] of their liberty to marry and of their property without due process of law under the Fourteenth Amendment" and "violate[d] their rights under the equal protection clause of the Fourteenth Amendment." Baker v. Nelson, Jurisdictional Stmt., No. 71-1027, at 3 (Feb. 11, 1971).

The Minnesota Supreme Court "necessarily decided" those issues when it rejected claims that, by the denial of their application for a marriage license, "petitioners are deprived of liberty and property without due process and are denied the equal protection of the laws, both guaranteed by the Fourteenth Amendment." Baker, 191 N.W.2d. at 186. The court rebuffed the claim that same-sex marriage was a fundamental right, holding that "[t]he due process clause of the Fourteenth Amendment is not a charter for restructuring [marriage] by judicial legislation." Id. The court also held that equal protection was not offended by limiting marriage to a man and a woman without requiring proof of ability or willingness to procreate. According to the court, "the classification is no more than theoretically imperfect," and "'[t]he Constitution does not

require things which are different in fact or opinion to be treated in law as though they were the same.'" Id. at 187 and n.4 (quoting Tigner v. Texas, 310 U.S. 141, 147 (1940)).  The court also repudiated any analogy between the traditional definition of marriage and the anti-miscegenation laws invalidated in Loving v. Virginia, 388 U.S. 1 (1967): "[I]n commonsense and in a constitutional sense, there is a clear distinction between a marital restriction based merely upon race and one based upon the fundamental difference in sex."  Baker, 191 N.W.2d at 187.

Given the analysis in the Minnesota Supreme Court's opinion and the statement of issues in the jurisdictional statement challenging that decision, the Supreme Court's Baker decision is controlling on the constitutionality of State laws defining marriage as between a man and a woman.  Plaintiffs' assertion "intervening doctrinal developments have limited Baker's precedential effect" is misplaced for at least two reasons.

First, lower federal courts do not have the option of departing from binding precedent simply because they believe it has been undercut by later "doctrinal developments."  In Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477 (1989), the Supreme Court held in no uncertain terms: "If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions," lower courts "should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."  Id. at 484.  Baker "directly controls" here.

Second, and more fundamentally, none of the cases cited by Plaintiffs undercut Baker.  In fact, none of them even mention, much less discuss, Baker.

Frontiero v. Richardson, 411 U.S. 677, 688 (1973), held classifications based on sex are subject to heightened judicial scrutiny.  But the challenged laws do not classify based on sex.  See Section IV(C)(1)(c); Doc. 37 at 44.  Even if they did, however, they would meet heightened judicial scrutiny.

Romer v. Evans, 517 U.S. 620 (1996), had nothing to do with marriage laws and did not mention Baker.  Romer involved the elimination of all basic legal protections and rights of access to the ordinary political process normally available to all people within Colorado.  Romer applied "conventional" rational basis review in holding that a Colorado constitutional amendment violated equal protection by placing a "[s]weeping" and "unprecedented" ban on state and local laws offering gays and lesbians common protections from discrimination.  Id. at 627, 631-32, 633, 635.  Laws defining marriage between a man and a woman are not a classification "unprecedented in our jurisprudence."  Id. at 633.

Like Romer, Lawrence v. Texas, 539 U.S. 558, 578 (2003), did not address the constitutionality of state marriage laws; it also did not mention Baker.  Lawrence held two adults of the same sex had the right to engage in intimate sexual conduct without intervention of the government.  The Lawrence court expressly informed lower courts that the case did "not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter."  539 U.S. at 578; see also id. at 585 (O'Connor, J., concurring) (noting that "preserving the traditional institution of marriage" would be a legitimate state interest beyond moral disapproval).

Windsor also makes no mention of Baker and certainly does not inform lower courts that they are no longer bound by Baker.  Windsor dealt with the constitutionality of a federal law defining marriage, not a state law.  See Windsor v. United States, 699 F.3d 169, 178 (2d Cir. 2012), aff'd, 133 S. Ct. 2675 (2013) ("The question whether the federal government may constitutionally define marriage . . . is sufficiently distinct from the question in Baker: whether same-sex marriage may be constitutionally restricted by the states.").  The Windsor majority expressly disclaimed any intention to reach the issue decided in Baker, stating that its "opinion and its holding are confined to those lawful marriages" already authorized by state law.  133 S. Ct. at 2696.

Moreover, there is no inconsistency between Baker and Windsor's legal analysis. Indeed, Windsor reinforced and complemented Baker by emphasizing the need to safeguard the States' "historic and essential authority to define the marital relation" free from "federal intrusion." 133 S. Ct. at 2692. The majority stressed that, "[b]y history and tradition the definition and regulation of marriage . . . has been treated as being within the authority and realm of the separate States." Id. at 2689–90. Most significantly, the Court reaffirmed that "[t]he definition of marriage is the foundation of the State's broader authority to regulate the subject of domestic relations with respect to the '[p]rotection of offspring, property interests, and the enforcement of marital responsibilities.'" Id. at 2691 (quoting Williams v. North Carolina, 317 U.S. 287, 298 (1942)). And it was precisely because of its understanding of the marital relation as "'a virtually exclusive province of the States,'" id. at 2691 (quoting Sosna, 419 U.S. at 404), that the Court concluded that DOMA's refusal to respect New York's decision to permit same-sex marriage represented an impermissible "federal intrusion on state power." Id. at 2692. Of course, North Dakota's marriage laws are entitled to the same deference and respect that were provided to New York's laws.

When read together, Baker and Windsor establish a principled, federalism-based resolution to the difficult question of same-sex marriage: Baker leaves the definition of marriage for every State to decide for itself, while Windsor prohibits the federal government from interfering in a State's decision on how to define marriage. See Doc. 37 at 17-18, 25-26.

If the intent of the Supreme Court in any of the above cases was to overrule or limit Baker, the Court would have at least mentioned Baker. It did not in any of the cases. In fact, in both Lawrence and Windsor the Court unequivocally stated it was not addressing the issue of same-sex marriage. 133 S. Ct. at 2696; 539 U.S. at 578.

The Supreme Court's stay order in Herbert v. Kitchen, 134 S. Ct. 893 (2014), further demonstrates Baker remains controlling law. The Supreme Court granted the

application filed by Utah's governor and attorney general to stay enforcement of a district court's injunction determining that Utah's marriage laws are unconstitutional. Id. The stay request had been denied by the district court, Kitchen v. Herbert, No. 2:13-cv-217, 2013 WL 6834634 (D. Utah Dec. 23, 2013), and by the Tenth Circuit Court of Appeals, Kitchen v. Herbert, No. 13-4178, 2014 WL 2868044 (10th Cir. Dec. 24, 2013). The rigorous standards for a stay evidence Baker's continuing validity.

To obtain a stay, "an applicant must show (1) a reasonable probability that four Justices will consider the issue sufficiently meritorious to grant certiorari; (2) a fair prospect that a majority of the Court will vote to reverse the judgment below; and (3) a likelihood that irreparable harm will result from the denial of a stay." Hollingsworth v. Perry, 558 U.S. 183, 190 (2010) (per curiam). By granting the application, the Supreme Court made it clear that Utah had met the rigorous standards for a stay, including having a "fair prospect" of success on the merits. If Baker had been implicitly overruled or limited, the Supreme Court would not have granted the stay. Thus, the stay strongly evidences "intervening doctrinal developments" have not limited Baker's precedential effect.

> ### 2.   Bruning is controlling.[5]

Plaintiffs assert the analysis in Citizens for Equal Protection v. Bruning, 455 F.3d 859 (8th Cir. 2006), is "superseded" by Windsor. Yet a simple reading of Windsor demonstrates otherwise. See Doc. 37 at 25-26, incorporated by reference herein. In fact, to accept Plaintiffs assertion would require this Court to ignore the Windsor majority's clear limitation of its holding. See 133 S. Ct. at 2696.

Plaintiffs also attempt to distinguish Bruning by asserting it "did not resolve constitutional questions at issue in this case . . . ." Doc. 41 at 38. But Bruning involved an equal protection challenge to a Nebraska constitutional amendment which provided

---

[5] The binding effect of Bruning is discussed at Doc. 37 at 20-22 and incorporated by reference herein.

that "[o]nly marriage between a man and a woman shall be valid or recognized in Nebraska." 455 F.3d at 863 (quoting Neb. Const. art. I, § 29). The fact the <u>Bruning</u> plaintiffs also alleged the provision was an unconstitutional bill of attainder does not diminish the precedential value of the Eighth Circuit's equal protection analysis and holding, which was that the challenged provision "should receive rational-basis review under the Equal Protection Clause, rather than a heightened level of judicial scrutiny." <u>Id.</u> at 866; <u>see also id.</u> at 867 (stating appellees "are not entitled to strict scrutiny review"). Because rational-basis review does not apply when a fundamental right is involved, the Eighth Circuit's analysis necessarily determined there is no fundamental right to same-sex marriage. <u>See Gallagher v. City of Clayton</u>, 699 F.3d 1013, 1019 (8th Cir. 2012); <u>cf. Executive Air Taxi Corp. v. City of Bismarck</u>, 518 F.3d 562, 569 (8th Cir. 2008) ("A rational basis that survives equal protection scrutiny also satisfies substantive due process analysis.").

That the plaintiffs in <u>Bruning</u> were not married is not legally relevant to the issue of whether there is a fundamental right to same-sex marriage. The fact the plaintiffs in <u>Bruning</u> were not, and could not be, legally married simply highlights the recent development of same-sex marriage and that it is not deeply rooted in this Nation's history and tradition.

<u>Windsor</u> and <u>Bruning</u> are binding on this Court and dictate dismissal of Plaintiffs' Complaint.

    B.   <u>There is no fundamental right to marry someone of the same sex.</u>[6]

The Supreme Court has expressed "reluctan[ce] to expand the concept of substantive due process because guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended." <u>Collins v. City of Harker Heights</u>, 503 U.S.

---

[6] That there is no fundamental right to marry someone of the same sex is discussed at Doc. 37 at 37-43 and incorporated by reference herein.

115, 125 (1992) (citation omitted).  As a result, courts must "exercise the utmost care whenever . . . asked to break new ground in this field."  Id.

Determining whether there is a fundamental right to same-sex marriage is controlled by Washington v. Glucksberg, 521 U.S. 702 (1997), and requires two steps. The first is "a careful description of the asserted fundamental liberty interest," and the second is adding to the canon only "those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed."  Id. at 720–21 (quotations and citations omitted) (emphasis added). Carefully described, the interest asserted here is the fundamental right to marry someone of the same sex.  See Doc. 37 at 39-41.  Such an interest is undisputedly not "deeply rooted," having only recently been recognized, and even then by only certain states.

Plaintiffs assert they are seeking access to an existing right, rather than the declaration of a new one.  But the Supreme Court's most recent pronouncement on the subject, Windsor, indicated that same-sex marriage is a new development, not having been considered "until recent years," and rejected the Plaintiffs' assumption here that same-sex marriage is subsumed by the Court's "right to marry" precedents.  133 S. Ct. at 2689.  Windsor went on to note that "the limitation of lawful marriage to heterosexual couples . . . for centuries ha[s] been deemed both necessary and fundamental."  Id. (emphasis added); see also Lawrence, 539 U.S. at 567, 578 (right to intimate same-sex relationship free of criminal penalty does not imply a right to "formal recognition" of that relationship).   Under Windsor's characterization, then, same-sex-marriage is the antithesis of a fundamental right.

In Glucksberg, which involved an asserted right to assisted suicide, the Supreme Court concluded there was no fundamental right at stake because of a "consistent and almost universal tradition that has long rejected the asserted right, and continues explicitly

to reject it today . . . ."   521 U.S. at 723 (emphasis added).   The same is true of the asserted right to same-sex marriage here.   The Court in Glucksberg emphasized that simply because "many of the rights and liberties protected by the Due Process Clause sound in personal autonomy does not warrant the sweeping conclusion that any and all important, intimate, and personal decisions are so protected . . . ."   Id. at 727–28.

Furthermore, Plaintiffs' attempt to compare North Dakota's Marriage Laws to anti-miscegenation laws is misplaced.   Anti-miscegenation laws were odious measures that rested on invidious racial discrimination.   In contrast, as the Windsor majority put it, "marriage between a man and a woman no doubt ha[s] been thought of by most people as essential to the very definition of that term and to its role and function throughout the history of civilization."   133 S. Ct. at 2689.   In other words, defining marriage as the union of one man and one woman may be controversial in today's political climate, but it is not invidious.

C.     North Dakota marriage law does not violate equal protection.[7]

North Dakota's marriage law is rational.   Moreover, although not required, North Dakota has legitimate and compelling public interests in defining marriage as the union between one man and one woman.

1.     *The standard of review is rational basis*.

Bruning and Baker establish there is no fundamental right to same-sex marriage and sexual orientation is not a suspect class.   See Doc. 37 at 20-25, incorporated by reference herein.   Plaintiffs try to avoid these controlling precedents by misreading Windsor.   But Windsor did not apply heightened scrutiny on the basis of sexual orientation.

The Supreme Court analyzes sexual orientation cases under rational basis review despite repeated invitations to apply heightened scrutiny, including most recently in

---

[7] That North Dakota marriage law does not violate equal protection is discussed at Doc. 37 at 26-37 and incorporated by reference herein.

Windsor.  Windsor held that DOMA § 3 was invalid for lacking a "legitimate purpose." 133 S. Ct. at 2696.  This is standard rational-basis language, and contrasts sharply with the requirements of strict scrutiny and intermediate scrutiny.  See, e.g., Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 227 (1995) (strict scrutiny requires showing that law is "narrowly tailored" to "further compelling governmental interests"); Craig v. Boren, 429 U.S. 190, 197 (1976) (intermediate scrutiny requires that gender classifications "serve important governmental objectives" and be "substantially related to achievement of those objectives").

> a.      Alleged "animus" does not change the standard of review.

Evidence of an alleged illicit legislative motive or animus does not invalidate an otherwise constitutional statute.  City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 48 (1986).  Neither Romer nor Windsor, both of which discussed animus in the context of laws affecting gays and lesbians, changes the rational basis analyses.

Romer applied traditional rational basis analysis.  After noting the Court "will uphold the legislative classification so long as it bears a rational relation to some legitimate end," the Court wrote the challenged amendment, which withdrew and prohibited distinctive legal protection for gays and lesbians, "fails, indeed defies, even this conventional inquiry." 517 U.S. at 631, 632.  The Court continued by stating the amendment's "sheer breadth is so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class it affects; it lacks a rational relationship to legitimate state interests."  Id. at 632; see also id. at 635 ("The breadth of the amendment is so far removed from [the proffered] justifications that we find it impossible to credit them.").  The Court's discussion of animus was not to establish a new standard of review, but to identify the only possible purpose for the amendment.  Because the amendment was not directed to any legitimate purpose, the Court concluded that the amendment "classifies homosexuals not to further a proper legislative end but to make them unequal to everyone

else." Id. at 635.  The amendment was not unconstitutional because of alleged animus, but because it lacked a rational relationship to any legitimate purpose.

Windsor discussed animus to explain "DOMA's unusual deviation from the usual tradition of recognizing and accepting state definitions of marriage."  133 S. Ct. at 2693. According to the Court, DOMA's unusual deviation from the usual tradition of recognizing and accepting state definitions of marriage was "strong evidence of a law having the purpose and effect of disapproval of that class."  Id.  Windsor did not establish a new standard of review.  At most it held a statute is not rationally related to a legitimate public purpose if its classification can be explained by nothing more than sheer animus against an unpopular group.  To read Windsor otherwise is inconsistent with past Supreme Court cases.  See, e.g., Bd. of Tr. of the Univ. of Alabama v. Garrett, 531 U.S. 356, 367 (2001) ("[B]iases may often accompany irrational (and therefore unconstitutional) discrimination, [but] their presence alone does not a constitutional violation make."); Playtime Theatres, Inc., 475 U.S. at 48 ("'It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive . . . .'" (quoting United States v. O'Brien, 391 U.S. 367, 383 (1968))); see also City of Mobile v. Bolden, 446 U.S. 55, 92 (1980) (Stevens, J., concurring in the judgment) ("[A] political decision that is supported by valid and articulable justifications cannot be invalid simply because some participants in the decisionmaking process were motivated by a purpose to disadvantage a minority group.").

Animus was discussed in Romer and Windsor simply because there was no other way to explain the sharp departure of the laws in those cases from long-established legal precedent.  That is not true of North Dakota's traditional marriage laws.

>   b.   North Dakota's marriage laws are based on legitimate state
>        interests, not animus.

North Dakota's marriage laws are supported by legitimate state interests.  See Section IV(C)(2)-(4); Doc. 37 at 30-37.  They are also perfectly consistent with "the usual tradition of recognizing and accepting state definitions of marriage."  133 S. Ct. at 2693.  And the history of North Dakota's marriage laws does not evidence animus.  Thus, in this circumstance, animus does not even come into play.

The mere act of codifying or constitutionalizing the existing common-law and age-old marriage definition does not show animus.  "[M]arriage between a man and a woman no doubt ha[s] been thought of by most people as essential to the very definition of that term and to its role and function throughout the history of civilization."  Windsor, 133 S. Ct. at 2689.  It is implausible to infer that marriage was invented thousands of years ago, and subsequently maintained over the centuries by governments all across the globe, solely as a tool to discriminate against homosexuals.  It is just as implausible to infer that North Dakota's decision to codify the longstanding, traditional definition of marriage somehow suddenly bespeaks animus towards homosexuals.  As Justice O'Connor wrote in her concurrence in Lawrence, legitimate state interests, such as "preserving the traditional institution of marriage," "exist to promote the institution of marriage beyond mere moral disapproval of an excluded group."  539 U.S. at 585 (O'Connor, J., concurring).  And as observed in Hernandez v. Robles, 855 N.E.2d 1, 8 (N.Y. 2006), "the traditional definition of marriage is not merely a by-product of historical injustice.  Its history is of a different kind."  The court continued:

> The idea that same-sex marriage is even possible is a relatively new one.
> Until a few decades ago, it was an accepted truth for almost everyone who
> ever lived, in any society in which marriage existed, that there could be
> marriages only between participants of different sex.  A court should not
> lightly conclude that everyone who held this belief was irrational, ignorant or
> bigoted.

Id.; see also Standhardt v. Superior Court, 77 P.3d 451, 465 (Ariz. Ct. App. 2003) ("Arizona's prohibition of same-sex marriages furthers a proper legislative end and was not

enacted simply to make same-sex couples unequal to everyone else."); In re Marriage of J.B. & H.B., 326 S.W.3d 654, 680 (Tex. Ct. App. 2010) (rejecting argument that Texas laws limiting marriage and divorce to opposite-sex couples "are explicable only by class-based animus").

Plaintiffs appear to argue the adoption and passage of N.D. Const. art. XI, § 28 and N.D.C.C. §§ 14-03-01 and 14-03-08 evidences animus.  But the People and their elected officials enacted the challenged marriage laws to protect the electorate's right to define marriage for their community.   The challenged laws further this purpose by ensuring that courts cannot interpret North Dakota's marriage laws to apply to same-gender couples.   They also further this purpose by ensuring that marriage will not be indirectly redefined in North Dakota through the recognition of other marriages or domestic unions solemnized elsewhere.

Windsor directly supports this important interest.  Indeed, a central focus of that decision is the right of States to define the marital relation.  See, e.g., 133 S. Ct. at 2691 ("The definition of marriage is the foundation of the State's broader authority to regulate the subject of domestic relations[.]"); id. at 2692 (discussing the State's "essential authority to define the marital relation").   More specifically, Windsor acknowledges that the Constitution permits States to define marriage through the political process, extolling the importance of "allow[ing] the formation of consensus" when States "shap[e] the destiny of their own times" on critical questions like the definition of marriage.  Id.

To hold adoption and passage of N.D. Const. art. XI, § 28 and N.D.C.C. §§ 14-03-01 and 14-03-08 evidence animus would malign the motives of every North Dakota legislator who voted for N.D.C.C. §§ 14-03-01 and 14-03-08 and every citizen who voted for N.D. Const. art. XI, § 28.  It is, of course, impossible to discern from the legislative history of N.D.C.C. §§ 14-03-01 and 14-03-08 why individual legislators voted in favor of the bill.  See Palmer v. Thompson,  403 U.S. 217, 224-25 (1971) ("it is extremely difficult for a court to ascertain the motivation, or collection of different

motivations, that lie behind a legislative enactment."); id. at 225 ("It is difficult or impossible for any court to determine the 'sole' or 'dominant' motivation behind the choices of a group of legislators."); United States v. O'Brien, 391 U.S. 367, 383-84 (1968) ("Inquiries into congressional motives or purposes are a hazardous matter. . . . What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork."); Edwards v. Aguillard, 482 U.S. 578 (1987) (Scalia, J., dissenting) (stating "determining the subjective intent of legislators is a perilous enterprise"). The official history, however, indicates some of the reasons some legislators supported the bill.[8]   It also shows those legislators' respect for, not animus towards, gays and lesbians.

For example, in written testimony, Senator Darlene Watne, co-sponsor of the bill, explained the purpose of the bill: "This bill is needed in our State to combat recognition of marriages other than between a man and woman now happening in other states – the most obvious, Hawaii."  Doc. 44-5.  Testifying regarding the purpose of the bill, she explained:

> Simply, this bill means the law in another state that recognizes marriages other than between a man and woman will be not forced into recognition in North Dakota.  This is important in a state with two air bases.  If we were to recognize such unions, the areas of laws, welfare benefits.  Without this law we will face a major revamp of laws in these areas, among others, if such recognition were forced upon us.   If our state does decide to recognize same sex marriages in the future, these laws should be reviewed beforehand so we are pro-active, not re-active in what we do. We may be heading off a threat that will never appear, but the constituents who have contacted me feel it is real.

Minutes of Senate Standing Comm. on S.B. 2230 at 3 (Feb. 5, 1997).  She also specifically noted: "I do not look at it as gay bashing, mean spirited, or anything of that sort.  I have wonderful gay and lesbian friends and wouldn't hurt them for the world."  Id.

---

[8] Rarely are legislative decisions motivated solely by a single concern, legislators properly being concerned with balancing numerous competing considerations.

Representative Sally M. Sandvig, another co-sponsor of the bill, wrote:

> This bill is a definition-of-marriage bill, not a gay-bashing bill.  It would define marriage and spouse in Century Code for use in interpreting and applying laws.  It would also allow the state to recognize marriages only between one man and one woman as husband and wife.
>
> This would specify the type of union that the state would recognize as a marriage and would eliminate platonic relationships being recognized as such.

Hearing before the Senate Judiciary Comm. on S.B. 2230 at 3 (written testimony of Sally M. Sandvig, Representative) (Feb. 5, 1997).

Speaking about the bill, Senator John Andrist said he "feels it is a preventative measure to prevent our law from changing by other means and hopes no one construes it as gay bashing."  Minutes of Senate Standing Comm. on S.B. 2230 at 2 (Feb. 5, 1997).

Representative James Kerzman favored the bill to benefit children.  He stated: "I favor this bill.  It is much more difficult for children if they are not in a traditional family.  We need that as a benchmark."  Minutes of House Standing Comm. on S.B. 2230 at 3 (Mar. 11, 1997).

Although not a statement by a legislator, the written testimony of the North Dakota Catholic Conference further evidences the basis of the bill was not animus.  The North Dakota Catholic Conference wrote:

> Our position is not motivated by animosity toward homosexual persons.  The Catholic Church insists that society respect the dignity of all persons, including those with a homosexual orientation.  Homosexual persons have a right to and deserve our respect, compassion, and understanding.  We condemn attacks, abuse, and unjust discrimination based on sexual orientation.   Upholding the dignity of all persons is not, however, inconsistent with upholding the essential institution of marriage.  We urge North Dakotans to uphold both.

Hearing before the Senate Judiciary Comm. on S.B. 2230 (written testimony of Christopher T. Dodson, Executive Dir.) (Feb. 5, 1997).

The legislative history shows a primary purpose of the bill was to clearly define "marriage" in North Dakota so it could not be judicially misconstrued and to ensure

marriage in North Dakota would not be indirectly redefined through recognition of same-sex or polygamous marriages or domestic unions solemnized elsewhere.  Legislative action to clearly define state law in no way evidences animus.

It is also impossible to say what was in voters' minds when they passed N.D. Const. art. XI, § 28.  A court should "be reluctant to probe the minds of the voters in an attempt to quantify the effects of the[ ] various factors" leading to passage of a measure. Kardules v. City of Columbus, 95 F.3d 1335, 1355 (6th Cir. 1996).

However, grounds to strike down North Dakota's marriage laws would not exist even if some legislators or voters had animus against gays or lesbians when they voted. "[A] political decision that is supported by valid and articulable justifications cannot be invalid simply because some participants in the decisionmaking process were motivated by a purpose to disadvantage a minority group." City of Mobile v. Bolden, 446 U.S. 55, 92 (1980) (Stevens, J., concurring in judgment).  As demonstrated, North Dakota's marriage laws are supported by multiple rational and legitimate justifications

North Dakota's citizens have no more chosen to preserve the vital social institution of man-woman marriage out of animus towards gays and lesbians than they have chosen to preserve the vital social institution of private property out of animus towards people with few worldly goods.  This conclusion is reinforced by application of the Supreme Court's analytical approach in Windsor.  There the Court inquired whether DOMA's discrimination between two classes of lawfully married couples in disregard of State law was "of an unusual character" and whether DOMA was "motiv[ated] by an improper animus or purpose."  133 S. Ct. at 2693.  The Court reached a "Yes" answer to both questions. Here, however, under the same analytical approach, "No" is without doubt the right answer to both questions.

First, as Windsor forcefully reaffirmed, the States define and regulate marriage within their respective jurisdictions; their authority there is virtually plenary.  Over the history of this Nation, the States have usually exercised that power to give the law's

imprimatur and protection to the man-woman marriage institution.  Indeed, before 2003, that is exactly how every State had always exercised that power.  Since 2003, that has continued as the usual way.  Indeed, DOMA's rejection of New York's marriage definition was as "unusual" a government action as North Dakota's perpetuation of man-woman marriage is a "usual" one.  Those actions are literally at opposite ends of the unusual/usual spectrum.  Thus, unlike in Windsor, the challenged government action here is not "of an unusual character."

Second, large and compelling differences exist between DOMA's decision regarding New York married couples (what Windsor struck down) and North Dakota's decision to preserve man-woman marriage (what Windsor supports).  Most obviously, North Dakota exercised, just as New York did, its sovereign powers over the marriage institution within its borders, whereas the federal government with DOMA acted without delegated authority because "'the Constitution delegated no authority to the Government of the United States on the subject of marriage and divorce.'"  Windsor, 133 S. Ct. at 2691 (internal quotations omitted).

Third, North Dakota decided to preserve the man-woman marriage institution.  Because of the very nature of that institution, North Dakota's decision is far different, in a profoundly substantive way, from the federal government's decision in DOMA.  The federal government had no effective or constitutional power to preserve the man-woman marriage institution in New York exactly because that State had already used its sovereign powers to mandate a genderless marriage regime and thereby de-institutionalize over time man-woman marriage.  But North Dakota has both effective and constitutional power to preserve the man-woman marriage institution and has chosen to use it.

Fourth, Plaintiffs cannot derive an animus conclusion from a supposed absence of legitimate reasons for the governmental action because, as shown, there are multiple, rational (even compelling), legitimate reasons for North Dakota's Marriage Laws.  See

Section IV(C)(2)-(4); Doc. 37 at 30-37.   Moreover, the challenged statutes' legislative history refutes the argument the statutes were adopted out of a "bare desire to harm."

As noted at the beginning of this brief, marriage and domestic relations is "an area that has long been regarded as a virtually exclusive province of the States." Sosna, 419 U.S. at 404.  Exercising their constitutional right, the People of North Dakota have chosen between two mutually exclusive marriage institutions.  The people of some other states have chosen differently and may disagree with North Dakota's decision. But it is North Dakota's decision, not the people of New York, and not the federal courts.

The People's use of the lawful electoral process to decide one of the most profound and divisive questions of our day—the definition of marriage—in no way evidences animus towards any group.

> c.   North Dakota's marriage laws do not discriminate based on gender.[9]

In allowing and recognizing marriages only between one man and one woman, North Dakota law affects men as a class and women as a class identically, to the disadvantage of neither.  It neither permits a man nor a woman to marry someone of the same gender, and it does not recognize a genderless out-of-state marriage of a man or a woman.   Plaintiffs' comparison to the anti-miscegenation laws at issue in Loving is inappropriate.  In the sex-discrimination context, "[a]ll of the [Supreme Court's] seminal . . . decisions . . . have invalidated statutes that single out men or women as a discrete class for unequal treatment."   Baker v. State, 744 A.2d 864, 880 n.13 (Vt. 1999) (collecting cases) (emphasis added).  In contrast, North Dakota's marriage definition is not "directed toward persons of any particular gender" and does not "affect people of any particular gender disproportionately such that a gender-based animus [could] reasonably be perceived."   Sevcik v. Sandavol, 911 F. Supp. 2d 996, 1005 (D. Nev. 2012); see also Jackson v. Abercrombie, 884 F. Supp. 2d 1065, 1098 (D. Hawaii 2012).

---

[9] That North Dakota's marriage laws do not discriminate based on gender is discussed at Doc. 37 at 44, and incorporated by reference herein.

Moreover, contrary to Plaintiffs' assertion, North Dakota does not define "the right to marry by reference to those permitted to exercise that right."  Doc. 41 at 18.  Plaintiffs, irrespective of gender, are permitted to marry under N.D.C.C. ch. 14-03.  They are not, however, like every other North Dakota citizen, irrespective of gender, permitted to marry someone of the same sex, multiple spouses, someone already married, someone under the appropriate age, their parent or child, their sibling, etc.  North Dakota's marriage laws do not single out men or women as a discrete class and, accordingly, are reviewed under the rational basis standard of review.

> 2.    *The challenged constitutional provision and laws are rational and serve legitimate, compelling public interests.*

"In an equal protection case of this type, 'those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker.'" Arkansas State Highway Emp. Local 1315 v. Kell, 628 F.2d 1099, 1103 (8th Cir. 1980) (quoting Vance v. Bradley, 440 U.S. 93, 111 (1979).  The Equal Protection Clause allows the States wide latitude, requiring merely that "there is a plausible public policy reason for the classification, the legislative facts on which the classification is apparently based may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational."  Hawkeye Commodity Promotions, Inc. v. Vilsack, 486 F.3d 430, 442 (8th Cir. 2007) (quoting Nordlinger v. Hahn, 505 U.S. 1, 11 (1992)).

In their earlier pleading, State Defendants noted three rational reasons for limiting marriage to opposite-sex couples: (1) only opposite sex couples can naturally procreate; (2) children are benefited by being raised by a mother and a father; and (3) a desire to proceed cautiously before fundamentally altering the nature of marriage. Doc. 37 at 30-37.  Plaintiffs' disagreement, factually or politically, with these reasons for North Dakota adopting traditional marriage is irrelevant because North Dakota's

"legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data."  F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307, 315 (1993); see also cases cited at Doc. 37 at 34.

With regard to the first two reasons, the Legislature and People of North Dakota, based on history, experience, and studies, could rationally conclude that North Dakota's child-centric, man-woman marriage helps develop a culture that formally links mothers and fathers with their offspring so as to maximize the welfare of children and, hence, of the community.  That culture—and the man-woman definition on which it is based—arises from a biological and sociological reality: Procreation is an inherently gendered enterprise; no child can be conceived without a man and a woman.

Plaintiffs apparently argue a legislator or voter could not reasonably conceive that children generally are benefited by being raised by a mother and a father or by having gender-complementarity in their upbringing.  But as a matter of law this Court should hold there is at least "a plausible public policy reason" for North Dakota's adoption of traditional marriage, that a legislator or voter could reasonably conceive that children generally are benefited by being raised by a mother and a father or by having gender-complementarity in their upbringing.  It should do so both because numerous courts and judicial officers have reached the same conclusion[10] and because numerous

---

[10] See, e.g., Windsor, 133 S. Ct. at 2689 (explaining "marriage between a man and a woman no doubt had been thought of by most people as essential to the very definition of that term and to its role and function throughout the history of civilization"); Adoptive Couple v. Baby Girl, 133 S. Ct. 2552, 2582 (2013) (Sotomayor, J., dissenting) (noting rules "understanding that the biological bond between a parent and a child is a strong foundation on which a stable and caring relationship may be built"); Gonzales v. Carhart, 550 U.S. 124, 159 (2007) ("Respect for human life finds an ultimate expression in the bond of love the mother has for her child."); Bowen v. Gilliard, 483 U.S. 587, 614 (1987) (Brennan, J., dissenting) (noting the "considerable scholarly research, which indicates that '[t]he optimal situation for the child is to have both an involved mother and an involved father'"); Skinner v. Oklahoma, 316 U.S. 535, 541 (1942) ("Marriage and procreation are fundamental to the very existence and survival of the race."); Murphy v. Ramsey, 114 U.S. 15, 45 (1885) ("[C]ertainly, no legislation can be supposed more wholesome and necessary in the founding of a free, self-governing commonwealth, fit to take rank as one of the co-ordinate states of the Union, than that which seeks to establish it on the basis of the idea of the family, as consisting in and springing from the

studies have reached that conclusion.[11]   Moreover, contrary to the implication in Plaintiffs' brief, see Doc. 41 at 31-32, the research on how children are affected by being reared in a same-sex household is inconclusive and underdeveloped.[12]

---

union for life of one man and one woman . . . ."); Santosky v. Kramer, 455 U.S. 745, 760 n.11 (1982) (stating "[s]ome losses cannot be measured," and a child not knowing his natural parents "may well be far-reaching"); Parham v. J.R., 442 U.S. 584, 602 (1979) (stating the law itself "historically . . . has recognized that natural bonds of affection"— i.e., biological connections—"lead parents to act in the best interests of their children"); Hernandez, 855 N.E.2d at 7 ("Intuition and experience suggest that a child benefits from having before his or her eyes, every day, living models of what both a man and a woman are like."); Conaway v. Deane, 932 A.2d 571, 630 (Md. 2007) ("In light of the fundamental nature of procreation, and the importance placed on it by the Supreme Court, safeguarding an environment most conducive to the stable propagation and continuance of the human race is a legitimate government interest."); id. (explaining "marriage enjoys its fundamental status due, in large part, to its link to procreation"); id. at 630-31 ("This 'inextricable link' between marriage and procreation reasonably could support the definition of marriage as between a man and a woman only, because it is that relationship that is capable of producing biological offspring of both members (advances in reproductive technologies notwithstanding).").

[11] Authorities support the proposition children are benefited by being raised by a mother and a father.  Just a few examples follow: Douglas W. Allen, High School Graduation Rates Among Children of Same-Sex Households, 11 Rev. Econ. Household 635, 653-54 (2013) (concluding children living with same-sex parents perform poorer in school compared to children from married opposite sex families); Mark Regnerus, How Different Are the Adult Children of Parents Who Have Same-Sex Relationships? Findings from the New Family Structures Study, 41 Soc. Sci. Res. 752 (2012) (finding significant differences between children raised by married mothers and fathers and those raised in other family structures, including those raised by same-sex couples); Mark Regnerus, Parental Same-Sex Relationships, Family Instability, and Subsequent Life Outcomes for Adult Children: Answering Critics of the New Family Structures Study with Additional Analysis, 41 Soc. Sci. Res. 1367, 1377 (2012); The Witherspoon Institute, Marriage and the Public Good: Ten Principles 18 (2008) (stating "the larger empirical literature on child well-being suggests that the two sexes bring different talents to the parenting enterprise, and that their children benefit from growing up with both biological parents"); David Popenoe, Life Without Father: Compelling New Evidence That Fatherhood & Marriage are Indispensable for the Good of Children & Society 146 (1996) ("The burden of social science evidence supports the idea that gender-differentiated parenting is important for human development and that the contribution of fathers to childrearing is unique and irreplaceable.").

[12] See Douglas W. Allen, High School Graduation Rates Among Children of Same-Sex Households, 11 Rev. Econ. Household 635, 636-38 (2013) (stating "the literature on child development in same-sex households is lacking on several grounds" and explaining the grounds); Loren Marks, Same-Sex Parenting and Children's Outcomes: A Closer Examination of the American Psychological Association's Brief on Lesbian and Gay Parenting, 41 Soc. Sci. Res. 735, 748 (2012) (noting significant flaws in 59 studies conducted on same-sex parenting that involved small, convenience samples and that the generalized claim of no difference was "not empirically warranted"); The Witherspoon Institute, Marriage and the Public Good: Ten Principles 18 (2008) (stating "the social scientific research on same-sex marriage is in its infancy," the current

Plaintiffs do not address North Dakota's rational decision to proceed cautiously before fundamentally altering the nature of marriage. That decision is rational. As explained by Justice Alito: "Family structure reflects the characteristics of a civilization, and changes in family structure and in the popular understanding of marriage and the family can have profound effects." Windsor, 133 S. Ct. at 2715. He further explained: "The long-term consequences of this change [same-sex marriage] are not now known and are unlikely to be ascertainable for some time to come. . . . At present, no one— including social scientists, philosophers, and historians—can predict with any certainty what the long-term ramifications of widespread acceptance of same-sex marriage will be." Id. at 2715-16. "[I]t sometimes takes decades to document the effects of social changes." Id. at 2715 n.5.

It is imminently rational for North Dakota to proceed cautiously when confronted with a possible change to the foundational social institution of marriage, a change that could cause far reaching, unintended, and irreversible changes and harms to North Dakota's children and citizens.

    3.    *The classification in the challenged laws is permissible*.

Plaintiffs' argument North Dakota's marriage laws are not rational because they are over- and under-inclusive is misplaced. Moreover, the Eighth Circuit already rejected the under-inclusive and over-inclusive argument in Bruning. See 455 F.3d at 867-68.

Rational basis review compels the Court to accept any legislative "generalizations even when there is an imperfect fit between means and ends." Heller v. Doe, 509 U.S. 312, 321 (1993). "[T]he Constitution does not require the [State] to draw the perfect line nor even to draw a line superior to some other line it might have

---

research on how children are affected by being reared by same-sex couples "is inconclusive and underdeveloped," and that "we do not yet have any large, long-term, longitudinal studies" addressing the issue).

drawn.  It requires only that the line actually drawn be a rational line."  Armour v. City of Indianapolis, 132 S. Ct. 2073, 2083 (2012); see also cases cited at Doc. 37 at 28.

Significantly, the State establishes the requisite relationship between its interests and the means chosen to achieve those interests when "the inclusion of one group promotes a legitimate governmental purpose, and the addition of other groups would not[.]"  Johnson v. Robison, 415 U.S. 361, 383 (1974).  Thus, the relevant inquiry here is not whether excluding same-sex couples from marriage furthers the State's interest in encouraging biological mothers and fathers to jointly raise their children.  "Rather, the relevant question is whether an opposite-sex definition of marriage furthers legitimate interests that would not be furthered, or furthered to the same degree, by allowing same-sex couples to marry."  Jackson, 884 F. Supp. 2d at 1107.  Simply put, "the correct inquiry under rational basis review is whether allowing opposite-sex couples to marry furthers legitimate governmental interests."  Andersen v. King Cnty., 138 P.3d 963, 984 (Wash. 2006).  "[T]he state is not required to show that denying marriage to same-sex couples is necessary to promote the state's interest or that same-sex couples will suffer no harm by an opposite-sex definition of marriage."  Jackson, 884 F. Supp. 2d at 1106.  "[T]he constitutional inquiry means little if the entire focus, and perhaps outcome, may be so easily altered by simply rewording the question," as Plaintiffs attempt to do here.  Andersen, 138 P.3d at 985; see also Morrison v. Sadler, 821 N.E.2d 15, 23 (Ind. Ct. App. 2005) ("The key question in our view is whether the recognition of same-sex marriage would promote all of the same state interests that opposite-sex marriage does, including the interest in marital procreation. If it would not, then limiting the institution of marriage to opposite-sex couples is rational . . . .").  Under this analysis, North Dakota's man-woman marriage definition easily satisfies constitutional review.

Sexual relationships between men and women – and only such relationships – naturally produce children, and they often do so unintentionally.  By granting recognition

and support to man-woman couples, marriage generally makes those potentially procreative relationships more stable and enduring, and thus increases the likelihood that each child will be raised by the man and woman whose sexual union brought the child into the world.

Sexual relationships between individuals of the same sex, by contrast, do not provide children with both their mother and their father. Nor do they risk unintentionally creating children as the natural byproduct of their sexual relationship. Same-sex couples thus do not further society's compelling interest in connecting children to both their mother and their father like sexual relationships between men and women do. "[T]he State does not have the same interest in sanctioning marriages between couples who are incapable of procreating as it does with opposite-sex couples." Standhardt, 77 P.3d at 463-64; see also id. at 463 ("Because same-sex couples cannot by themselves procreate, the State could also reasonably decide that sanctioning same-sex marriages would do little to advance the State's interest in ensuring responsible procreation within committed, long-term relationships."); Andersen, 138 P.3d 984-85 ("Granting the right to marry to opposite-sex couples clearly furthers the governmental interests advanced by the State."). It is, therefore, constitutional for North Dakota to maintain an institution to address the unique opportunities that the procreative potential of sexual relationships between men and women presents. See, e.g., Vance v. Bradley, 440 U.S. 93, 109 (1979) (stating that a law may "dr[aw] a line around those groups . . . thought most generally pertinent to its objective"); Johnson, 415 U.S. at 378 (stating that a classification will be upheld if "characteristics peculiar to only one group rationally explain the statute's different treatment for the two groups"). Consequently, the "commonsense distinction," Heller, 509 U.S. at 326, that North Dakota law has always drawn between man-woman couples and all other relationships "is neither surprising nor troublesome from a constitutional perspective." Nguyen v. INS, 533 U.S. 53, 63 (2001).

Moreover, it is rational for the State not to limit marriage only to opposite-sex couples who are willing or able to procreate.  First, any inquiry by the State into the ability or willingness of a couple to actually bear a child during marriage would be unduly intrusive, impractical, and violate the fundamental right to marital privacy recognized in Griswold v. Connecticut, 381 U.S. 479, 484-86, 493 (1965).  Furthermore, an opposite-sex couple who does not want to procreate may change their mind or procreate unintentionally.  The legislative distinction between opposite-sex couples and same-sex couples is made not because various opposite-sex couples actually procreate, but because they have the possibility of natural procreation. The distinction is rational because same-sex couples lack that possibility.

Plaintiffs' argument the classification is not rational because the State does not condition the right to marry on parenting ability completely ignores the basis for the classification – the rational legislative conclusion that children generally are benefited by being raised by a mother and a father or by having gender-complementarity in their upbringing.  The State does not define marriage based on any individual's ability to marry.  Because an individual's ability to marry is not a classification in the challenged laws, that issue has no bearing on the constitutionality of North Dakota's marriage laws.

Furthermore, Plaintiffs' arguments ignore the fact that marriage is a social institution and that each time a man-woman couple builds a marriage – regardless of their reproductive intentions or abilities, regardless of their parenting skills–that act strengthens the man-woman marriage institution and thereby enhances the power of its social communications, influence, and practices that North Dakota seeks to promote.

Similarly, Plaintiffs' argument that excluding same-sex couples from marrying accomplishes nothing ignores the reality that North Dakota can have only one social institution denominated "marriage," and that adoption of Plaintiffs' proposed genderless definition of marriage necessarily rejects and is contrary to the public interests served by traditional marriage.  See Section IV(C)(4).

28

Contrary to Plaintiffs' implication, the State has never stated that "opposite-sex couples provide the only proper setting for raising children." Doc. 41 at 31. What it has stated, by adoption of N.D. Const. art. XI, § 28, N.D.C.C. §§ 14-03-01 and 14-03-08, is that the social institution of traditional marriage provides valuable social benefits important to the well-being and stability of society and the development of children, particularly because it helps a greater portion of children know and be raised by their mother and father. Plaintiffs may not like those legislative facts, but they are rational and, therefore, the challenged laws are constitutional.

> 4.    *Redefining marriage as genderless would be contrary to the public interests promoted by traditional marriage.*

Marriage is a social institution which, like other social institutions, is based on shared public meanings, expectations, and understandings that influence behavior. When a social institution is changed, whether because shared public meanings have changed or through force of law, expectations, understandings, and behavior also change over time. Another social institution, with different meanings and norms, replaces the original one and the social benefits generated by the meanings and norms of the earlier social institution either dissipate or disappear. See Monte Neil Stewart, Marriage Facts, 31 Harv. J.L. & Pub. Pol'y 313, 327–28 (2008), and sources cited therein. Thus, if the man-woman definition at the core of North Dakota's understanding of marriage is replaced by a different meaning (i.e., the union of two or more consenting adults), the existing meaning would become deinstitutionalized and, as a result, the benefits produced by that original meaning would either wane or be lost.[13]

---

[13]  Sherif Girgis et al., What is Marriage? Man and Woman: A Defense (2011) (addressing multiple societal consequences of redefining marriage to include same-sex partners); id. at 7 (2011) (stating that if marriage is redefined to include same-sex partners, the law will teach that marriage is "essentially an emotional union" that has no inherent connection to procreation and family life); The Witherspoon Institute, Marriage and the Public Good: Ten Principles 7 (2008) ("Law and culture exhibit a dynamic relationship: Changes in one ultimately yield changes in the other, and together law and culture structure the choices that individuals see as available, acceptable, and choice-worthy.").

The law often supports social institutions "in order to give them formal recognition, bring legal and administrative arrangements into line with them, facilitate their use by members of the community who wish to do so, and encourage the transmission of belief in their value to future generations.  In many countries this is the significance of the legal recognition of monogamous marriage . . . ."  Joseph Raz, The Morality Of Freedom 161 (1986).  By adopting man-woman marriage, North Dakota communicates, as understood throughout most of history, that marriage's most vital public purpose is to encourage the creation of stable, husband-wife unions for the benefit of their children.[14]  People may also place great weight on romance, companionship, and mutual economic support—which the one man-one woman marriage institution also supports and nurtures.  But these private ends—though important—are not the principal interests the State pursues by regulating marriage.  The State's fundamental public interest in marriage lies in maximizing the welfare of children—present and future.

First and foremost, the man-woman definition of marriage promotes the interests of children by fostering a generally child-centric marriage culture that encourages parents routinely to subordinate their own private interests—emotional, sexual, career, recreational, etc.—to the needs of their children, present and future.  It teaches that marriage is "not primarily about adult needs for official recognition and support, but about the well-being of children and society . . . ."  Hernandez v. Robles, 805 N.Y.S.2d 354, 360 (N.Y. App. Div. 2005), aff'd, 855 N.E.2d 1 (N.Y. 2006).[15]  Plaintiffs' arguments rest on a very different understanding of the principal public purpose and meaning of marriage—one centered on accommodating adult relationship choices.  In their view, the most important purpose of marriage is to provide state recognition and approval of a couple's choice to

---

[14]   The philosopher Bertrand Russell bluntly noted that, "[b]ut for children, there would be no need of any institution concerned with sex."  Bertrand Russell, Marriage & Morals 77 (Liveright 1970).

[15]   This is not to say that other parents cannot make the same selfless, child-centric choices as a biological mother and father; they clearly can.  But the issue is the State's right to define marriage to orient it toward the welfare of children.

live with each other, to remain committed to one another, to form a household based on their own feelings about one another, and to join in an economic partnership and support one another and any dependents.  This formulation ignores the rationale for traditional marriage.  Tellingly, it does not focus on children as a principal object of the marital relationship.

While this adult-centric conception of marriage may have gained ascendancy in some jurisdictions, it does not hold in North Dakota, where the People, through the democratic process, have reaffirmed and perpetuated the child-centric model.  They, and hence the State, have steadfastly sought to reserve unique social recognition for man-woman marriage so as to encourage potentially procreative couples into the optimal, conjugal childrearing model.  Accordingly, redefining marriage as a genderless, adult-centric institution would fundamentally change North Dakota's child-centered meaning and purpose of marriage.  As the New Jersey Supreme Court explained: "To alter that meaning would render a profound change in the public consciousness of a social institution of ancient origin."  Lewis v. Harris, 908 A.2d 196, 222 (N.J. 2006); see also Windsor, 133 S. Ct. at 2715–16, n.6 (Alito, J., dissenting).

North Dakota cannot simply ignore the seismic shift that would occur by substantively redefining the social institution of marriage.

> One may see these kinds of social consequences of legal change as good, or as questionable, or as both.  But to argue that these kinds of cultural effects of law do not exist, and need not be taken into account when contemplating major changes in family law, is to demonstrate a fundamental lack of intellectual seriousness about the power of law in American society.

Institute for American Values, Marriage and the Law: A Statement of Principles 26 (2006); see also Institute for American Values, Marriage and the Law: A Statement of Principles 26 (2006) ("The public, shared understanding of a basic social institution like marriage is affected by how the law describes, understand, and enacts marriage.").

31

While other jurisdictions may choose to elevate adult-centric relationships, North Dakota has chosen a different course—using its constitutionally protected police power, including its authority over domestic-relations law—to further its considered judgment about how best to protect the interests of all its children.  Compelling North Dakota to redefine marriage to include same-sex couples—forcing it to replace its gendered marriage definition with a genderless one—would necessarily undermine the State's interest in promoting biological and gender-differentiated parenting.[16]

    5.    *The challenged laws satisfy heightened scrutiny.*

Although not required, the man-woman definition of marriage satisfies heightened scrutiny because even under that more demanding standard, "[t]he Constitution requires that [a State] treat similarly situated persons similarly, not that it engage in gestures of superficial equality." Rostker v. Goldberg, 453 U.S. 57, 79 (1981).  "To fail to acknowledge even our most basic biological differences," like those between same-sex couples and man-woman couples, "risks making the guarantee of equal protection superficial, and so disserving it." Nguyen, 533 U.S. at 73; accord id. at 63 (upholding a proof-of-citizenship law under heightened scrutiny because the two classes at issue – "[f]athers and mothers" – were "not similarly situated with regard to proof of biological parenthood"); Michael M. v. Superior Court, 450 U.S. 464, 471 (1981) (plurality) (upholding a statutory-rape law under heightened scrutiny because "young men and young women are not similarly situated with respect to the problems and the risks of sexual intercourse" since "[o]nly women may become pregnant").  Because man-woman couples and same-sex couples are not similarly situated with regard to the

---

[16] North Dakota's marriage policy does not dictate the private choices of its citizens.  The Supreme Court has long acknowledged a "basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy." Maher v. Roe, 432 U.S. 464, 475 (1977) (emphasis added).  By defining marriage as being between one man and one woman, North Dakota does not interfere with adults' ability to commit to an exclusive, loving relationship with others of the same sex, or to bring children into that relationship.

State's interest in connecting children to both biological parents, the challenged marriage laws withstand heightened scrutiny.

The State may logically project that redefining marriage poses a significant risk of bringing about adverse social consequences over time.   Even under heightened scrutiny, "courts must accord substantial deference to the [government's] predictive judgments."   Turner Broad. Sys., Inc. v. FCC, 520 U.S. 180, 195 (1997) (citation omitted); cf. Grutter v. Bollinger, 539 U.S. 306, 328 (2003) (deferring to a public university's "judgment that [racial] diversity [was] essential to its educational mission"). "Sound policymaking often requires [democratic decisionmakers] to forecast future events and to anticipate the likely impact of [those] events based on deductions and inferences for which complete empirical support may be unavailable."   Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 665 (1994) (plurality).

No one seriously disputes that legally redefining marriage as a genderless institution will have real-world consequences.   Complex social institutions like marriage comprise a set of norms, rules, patterns, and expectations that powerfully (albeit often unconsciously) affect people's choices, actions, and perspectives.   Marriage in particular is a pervasive and influential social institution that entails a complex set of personal values, social norms, and legal constraints that regulate particular intimate human relations.   See Joseph Raz, Ethics in the Public domain 23 (1994) ("When people demand recognition of gay marriages, they usually mean to demand access to an existing good.   In fact they also ask for the transformation of that good.   For there can be no doubt that the recognition of gay marriages will effect as great a transformation in the nature of marriage as that from polygamous to monogamous or from arranged to unarranged marriage.").

### 6.     *Plaintiffs are not entitled to summary judgment*.

If this Court concludes North Dakota's legislative basis for adopting traditional marriage is not entitled to the Court's deference, and thus subject to courtroom fact-

finding, Plaintiffs are still not entitled to summary judgment.  At most Plaintiffs would have created a genuine issue of material fact, requiring discovery and a trial to resolve the factual disputes.

## V.  Federal constitutional law does not require North Dakota to recognize same-sex marriages performed in other states.[17]

As explained above, North Dakota's marriage laws satisfy the requirements of the Due Process and Equal Protection Clauses of the Fourteenth Amendment, and North Dakota has a constitutionally valid policy to not recognize same-sex marriages regardless of where they are performed.  No other provision of the federal Constitution requires the State to recognize same-sex marriages contrary to its public policy.  "[T]he Full Faith and Credit Clause does not require a State to apply another State's law in violation of its own legitimate public policy."  Nevada v. Hall, 440 U.S. 410, 422 (1979).  "'Full Faith and Credit . . . does not . . . enable one state to legislate for the other or to project its laws across state lines so as to preclude the other from prescribing for itself the legal consequences of acts within it.'"  Id. at 423–24 (quoting Pac. Emp'rs Ins. Co. v. Indus. Accident Comm'n, 306 U.S. 493, 504–05 (1939)); see also Franchise Tax Bd. of California v. Hyatt, 538 U.S. 488, 494 (2003) ("[T]he Full Faith and Credit Clause does not compel a state to substitute the statutes of other states for its own statutes dealing with a subject matter concerning which it is competent to legislate.") (quoting Sun Oil Co. v. Wortman, 486 U.S. 717, 722 (1988)) (internal quotations omitted).

Plaintiffs' reliance on Windsor is misplaced.  Windsor did not hold states were required to recognize marriages from other states.  As previously demonstrated, Windsor emphasized the need to safeguard the States' "historic and essential authority to define the marital relation" free from "federal intrusion," 133 S. Ct. at 2692, prohibiting the federal government from interfering in a State's decision on how to define marriage. That is exactly what Plaintiffs are asking this Court to do.

---

[17] Plaintiffs' right to travel claim and recognition claim is addressed at Doc. 37 at 44-49 and incorporated by reference herein.

Forcing a State to recognize a relationship as a marriage simply because another jurisdiction does would effectively nationalize the domestic-relations policy of the most inventive sovereign.  If one State decided to permit polygamous marriages, all States would have to recognize polygamous marriages and permit them in their state; if one State decided to permit marriage between siblings, all States would have to recognize marriages between siblings and permit sibling marriages in their state.  Such an unprecedented holding would rob states of their constitutional legislative powers,[18] contravene well-established comity and full-faith-and-credit principles, and conflict with Windsor's acknowledgment that the Constitution permits variation between States' domestic-relations policies concerning which couples may marry.

North Dakota is not required to recognize marriages that are not "between one man and one woman"—whether same-sex, polygamous, or otherwise contrary to North Dakota law--performed in other States.

## VI.    If the Court grants Plaintiffs' motion, it should stay its ruling pending appeal.

In similar cases challenging other States' man-woman marriage definitions, the Supreme Court and the Ninth Circuit have ordered district courts to stay their rulings pending the exhaustion of all appeals.  See McQuigg v. Bostic, No. 14A196, 2014 WL 4096232 (Aug. 20, 2014) (granting application for stay); Herbert, 134 S. Ct. 893 (ordering that the "[p]ermanent injunction issued by the [district court]" is "stayed pending final disposition of the appeal"); Order, Latta v. Otter, No. 14-35420 (9th Cir. May 20, 2014), http://cdn.ca9.uscourts.gov/datastore/general/2014/05/20/14-35420a.pdf (granting the defendants' "motions to stay the district court's . . . order pending appeal").  A stay would similarly be appropriate in this case.

---

[18]   Forcing a state to recognize genderless marriages performed elsewhere "would be the most astonishingly undemocratic, counter-majoritarian political development in American history."  Patrick J. Borchers, Baker v. General Motors: Implications for Interjurisdictional Recognition of Non-Traditional Marriages, 32 Creighton L. Rev. 147, 150 (1998).

The Eighth Circuit considers "the following four factors in determining whether a stay is warranted: (1) the likelihood that a party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay." Iowa Utilities Bd. v. F.C.C., 109 F.3d 418, 423 (8th Cir. 1996). State Defendants satisfy those requirements.

The arguments in this memorandum establish that State Defendants are likely to succeed on the merits. As explained by the Eighth Circuit, State Defendants "'need not establish an absolute certainty of success.'" Id. (quoting Population Inst. v. McPherson, 797 F.2d 1062, 1078 (D.C. Cir. 1986)). "Instead, as the actual terms of the test indicate, the petitioners must show that they are 'likely' to succeed on the merits." Id. The Supreme Court and Ninth Circuit's grant of stays in similar cases demonstrate State Defendants satisfy this factor.

Regarding the second factor, it is "clear that a state suffers irreparable injury whenever an enactment of its people or their representatives is enjoined." Coal. for Econ. Equity v. Wilson, 122 F.3d 718, 719 (9th Cir. 1997). Moreover, North Dakota would be irreparably harmed absent a stay because it would be required to issue marriage licenses in violation of its law before the merits of this case are finally resolved, causing the State to experience unnecessary confusion, uncertainty, and conflict. See Evans v. Utah, No. 2:14CV55DAK, 2014 WL 2048343, at *1-4 (D. Utah May 19, 2014) (recounting the confusion, uncertainty, and conflict that resulted when a federal district court in Utah failed to stay its ruling in a similar case).

Harm to others if a stay is granted is, at best, temporary, if at all. Plaintiffs will suffer no injury because they do not have a constitutional right to genderless marriage or its recognition. In the unlikely event the Supreme Court creates such a right, Plaintiffs injury could be remedied at that time. Moreover, to the extent Plaintiffs assert they are currently denied state-law protections intended to safeguard married couples

36

and their families, Plaintiffs have alternative options to address those issues, such as executing powers of attorney, wills, and other probate documents to secure legal protections.

Finally, for the reasons already mentioned, there is significant public interest in granting the stay.

### CONCLUSION

Defendants Jack Dalrymple, in his official capacity as Governor, Wayne Stenehjem, in his official capacity as Attorney General, Ryan Rauschenberger, in his official capacity as Tax Commissioner, and Terry Dwelle, in his official capacity as State Health Officer, respectfully request that this Court deny Plaintiffs' Motion for Summary Judgment (Doc. 42) and grant State Defendants' Motion to Dismiss (Doc. 28).

Dated this 22nd day of August, 2014.

State of North Dakota
Wayne Stenehjem
Attorney General

By:       /s/ Douglas A. Bahr
Douglas A. Bahr
Solicitor General
State Bar ID No. 04940
Office of Attorney General
500 North 9th Street
Bismarck, ND 58501-4509
Telephone (701) 328-3640
Facsimile (701) 328-4300
Email dbahr@nd.gov

Attorneys for Defendants Jack Dalrymple, in his official capacity as Governor, Wayne Stenehjem, in his official capacity as Attorney General, Ryan Rauschenberger, in his official capacity as Tax Commissioner, and Terry Dwelle, in his official capacity as State Health Officer.

e:\dixie\cl\bahr\briefs\constitution.brf\ramsay\pleadings\msj opposition memorandum.docx

**CERTIFICATE OF SERVICE**

**Case No. 3:14-CV-57**

I hereby certify that on August 22, 2014, the following document: **MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** was filed electronically with the Clerk of Court through ECF, and that ECF will send a Notice of Electronic Filing (NEF) to Joshua Newville, Tom Fiebiger, and Scott Porsborg.

/s/ Douglas A. Bahr
Douglas A. Bahr
Solicitor General
State Bar ID No. 04940
Email dbahr@nd.gov

e:\dixie\cl\bahr\briefs\constitution.brf\ramsay\pleadings\msj opposition memorandum.docx