UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA

---

| | |
|---|---|
| **Ron Ramsay** and **Peter Vandervort**; | Court File No. 3:14–CV–57–(RRE-KKK) |
| | Case Type: Civil Rights / § 1983 |
| **Celeste** and **Amber Carlson Allebach**; | |
| **Brock Dahl** and **Austin Lang**; | |
| **Michele Harmon** and **Joy Haarstick**; | |
| **Bernie Erickson** and **David Hamilton**; | |
| **Matthew Lee Elmore** and **Beau Thomas Downey**; and | |
| **Stephanie** and **Siana Bock**, | **PLAINTIFFS' REPLY MEMORANDUM SUPPORTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| *Plaintiffs,* | |
| *vs.* | |
| **Jack Dalrymple**, in his official capacity as Governor; | |
| **Wayne Stenehjem**, in his official capacity as Attorney General; | |
| **Ryan Rauschenberger**, in his official capacity as State Tax Commissioner; | |
| **Terry Dwelle,** in his official capacity as State Health Officer; and | |
| **Charlotte Sandvik**, in her official capacity as Cass County Treasurer, | |
| *Defendants.* | |

---

i

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION ..................................................................................................................... 1

ARGUMENTS .......................................................................................................................... 1

    A.    The Constitutional Right to Marry is Not Limited to Different-Sex Couples ........................................................................................................................ 1

    B.    State Law Must Yield To Federal Constitutional Protections ..................................... 5

    C.    North Dakota's Marriage Bans Interfere With Plaintiffs' Fundamental Right To Remain Married ........................................................................................... 6

    D.    North Dakota's Marriage Bans Cannot Survive Any Level of Scrutiny ..................... 7

    E.    <u>Windsor</u> Supports A Finding Of Improper Purpose .................................................. 10

    F.    Proof Of Animus Is Not Necessary To Strike Down The Marriage Bans ............................................................................................................................ 11

    G.    Proceeding With Caution Is Not Rational Basis For The Marriage Bans ............................................................................................................................ 12

    H.    The State Confuses the Summary Judgment Standard .............................................. 13

    I.    No Stay Should Be Entered ....................................................................................... 13

CONCLUSION ........................................................................................................................ 14

**TABLE OF AUTHORITIES**

**Cases**

Baker v. Nelson, 409 U.S. 810 (1972) ...................................................................................4

Bd. of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356 (2001) .........................................9

Bostic v. Rainey, 970 F. Supp. 2d 456 (E.D. Va. 2014) .......................................................13

Bourke v. Beshear, 2014 WL 556729 (W.D. Ky. Feb. 12, 2014) ........................................13

City of Cleburne v. Cleburne Living Center, 473 U.S. 432 (1985) .....................................8

Cnty. of Sacramento v. Lewis, 523 U.S. 833 (1998) ............................................................4

De Leon v. Perry, 975 F. Supp. 2d 632 (W.D. Tex 2014) ...................................................3

DeBoer v. Snyder, 973 F. Supp. 2d 757 (E.D. Mich. 2014) ...........................................6, 12

Henry v. Himes, No. 1:14-cv-129, 2014 WL 1418395 (S.D. Ohio Apr. 14, 2014) ........4, 6

Kitchen v. Herbert, 961 F. Supp. 2d 1181 (D. Utah 2013) .......................................5, 12, 13

Lawrence v. Texas, 539 U.S. 558 (2003) ....................................................................4, 5, 9

Loving v. Virginia, 388 U.S. 1 (1967) ..............................................................................3, 5

Obergefell v. Wymyslo, 962 F. Supp. 2d 968 (S.D. Ohio 2013) ..........................................5

Romer v. Evans, 517 U.S. 620 (1996) ........................................................................8, 9, 11

Sosna v. Iowa, 419 U.S. 393 (1975) ....................................................................................5

U.S. Dept. of Agriculture v. Moreno, 413 U.S. 528 (1973) .................................................8

United States v. Windsor, 133 S. Ct. 2675 (2013) .......................................................*passim*

Vill. of Arlington Heights v. Metro. Housing Dev. Corp., 429 U.S. 252 (1977)...............11

Vill. Of Willowbrook v. Olech, 528 U.S. 562 (2000) ..........................................................8

W. Va. Bd. of Educ. v. Barnette, 319 U.S. 624 (1943) ........................................................6

Zablocki v. Redhail, 434 U.S. 374 (1978) ...........................................................................3

**INTRODUCTION**

North Dakota's marriage bans and anti-recognition laws violate the Fourteenth Amendment of the United States Constitution and the fundamental right to travel. In <u>United States v. Windsor,</u> 133 S. Ct. 2675 (2013), the Supreme Court struck down Section 3 of the Defense of Marriage Act ("DOMA"), which banned federal recognition of the marriages of same-sex couples, concluding that "no legitimate purpose overcomes the purpose and effect to disparage and to injure [same-sex couples]." <u>Id.</u> at 2696.

Since <u>Windsor,</u> at least three federal courts of appeals and eighteen federal district courts have concluded that state bans on marriage by same-sex couples, and laws prohibiting recognition of such marriages performed in other jurisdictions, violate either or both of the Due Process and Equal Protection Clauses of the Fourteenth Amendment. As Defendants concede, there are no factual disputes to be resolved by this Court. <u>See</u> Doc. 53 at 1–2. Among many other deficiencies, Defendants' arguments and submissions fail to identify any conceivable rational basis for North Dakota's marriage bans and anti-recognition laws. This Court should therefore conclude that North Dakota's laws violate the Fourteenth Amendment of the United States Constitution and should grant Plaintiffs' Motion for Summary Judgment.

**ARGUMENT**

**A.    The Constitutional Right to Marry is Not Limited to Different-Sex Couples**

As Plaintiffs demonstrated in their opening memorandum, the right to marry is a fundamental right. Doc. 43 at 7–12. Further, it is a right belonging to the individual that cannot be deprived because of the individual's sexual orientation. <u>Id</u>. Plaintiffs seek access to the same kind of marriage that is available to different-sex couples under North Dakota law, not the Defendants' reinterpretation of their claim as something it characterizes as "adult-centric"

marriage.

In their response brief, Defendants paint Plaintiffs and other loving, committed same-sex couples and their families as hostile aliens, competing with "nearly all human societies" and attempting to tear down a valuable social institution that has helped develop children and provide stability. Doc. 53 at 2–4. Defendants argue that North Dakota, "can have only one social institution denominated marriage" and that Plaintiffs lost "the social contest" when the state constitutional ban challenged in this litigation was enacted. Id. With thinly-veiled hysteria, Defendants caution the Court: "[t]his civil action is an important part of that campaign." Id. at 2.

Defendants argument is both inflammatory and wrong. The only support for the Defendants' characterization of marriage for same-sex couples as "consent-based" is Justice Alito's dissent in Windsor, where he describes such marriage as "the solemnization of mutual commitment," based on "strong emotional attachment and sexual attraction." 133 S. Ct. at 2718. The opinion of the Windsor majority—that is, the opinion of the Supreme Court—rejected that view, properly focusing instead on the effects of excluding same-sex couples and their children from marriage. Windsor, 133 S. Ct. at 2694–95. Like DOMA, North Dakota's bans burden the lives of same-sex couples "by reason of government decree, in visible and public ways . . . from the mundane to the profound," and make "it even more difficult for the children to understand the integrity and closeness of their own family and its concord with other families in their community and in their daily lives." Id. at 2694. The bans "also bring[] financial harm to children of same-sex couples," id. at 2695, by denying their families a multitude of benefits that the State and federal governments offer to spouses and their children.

As stated in the Complaint and in declarations supporting this motion, Plaintiffs seek marriage for the same reasons different-sex couples seek it, including the stability and protection

2

that it will bring to their children. They want their children and grandchildren to know that their family has the same status and recognition that other families enjoy. Two of the Plaintiff couples are currently raising children, as are many other same-sex couples in North Dakota. Some of the Plaintiff couples have grandchildren. The State's description of marriage for same-sex couples has no basis in the reality of Plaintiffs' or other same-sex couples' requests for the freedom to marry and to have their existing marriages recognized.

Defendants argue that Plaintiffs' citation to Loving v. Virginia, 388 U.S. 1 (1967) is misplaced because "anti-miscegenation laws were odious measures that rested on invidious racial discrimination." Doc. 53 at 12. But, the Supreme Court itself has explicitly rejected this idea. See Zablocki v. Redhail, 434 U.S. 374, 384 (1978) ("Although Loving arose in the context of racial discrimination, prior and subsequent decisions of this Court confirm that the right to marry is of fundamental importance *for all individuals*.") (emphasis added). See also: De Leon v. Perry, 975 F. Supp. 2d 632, 652 (W.D. Tex 2014) ("Instead of declaring a new right to interracial marriage, the Court [in Loving] held that individuals could not be restricted from exercising their 'existing' right to marry on account of their chosen partner. That is, an interracial marriage was considered to be a subset of 'marriage,' in the same way that same-sex marriage is included within the fundamental right to marry.")

Defendants also misconstrue Windsor, stating, "the Supreme Court's most recent pronouncement on the subject, Windsor, indicated that same-sex marriage is a new development," doc. 53 at 11, and arguing that Windsor rejects Plaintiffs due process analysis. According to Defendants: "Windsor went on to note that 'the limitation of lawful marriage to heterosexual couples . . . for centuries ha[s] been deemed both necessary and fundamental.'" Doc. 53 at 11 (quoting Windsor, 133 S. Ct. at 2689). The complete sentence from which

3

Defendants extract their quote reads: "The limitation of lawful marriage to heterosexual couples, which for centuries had been deemed both necessary and fundamental, *came to be seen in New York and certain other States **as an unjust exclusion***." Windsor, 133 S. Ct. at 2689 (emphasis added). Furthermore, the question of whether same-sex couples have the right to marry was not even before the Court; in any event, Justice Kennedy has elsewhere made clear that "history and tradition are the starting point but not in all cases the ending point of the substantive due process inquiry," Lawrence v. Texas, 539 U.S. 558, 572 (2003) (quoting Cnty. of Sacramento v. Lewis, 523 U.S. 833, 857 (1998)), and "times can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress." Id. at 579.

Defendants further fail to appreciate the significance of Lawrence for this case. Defendants argue that Lawrence is irrelevant because it did not explicitly reference Baker v. Nelson, 409 U.S. 810 (1972) and did not explicitly address the right of same-sex couples to marry. Doc. 53 at 7. But, as other courts addressing this issue have recognized, the court in Lawrence:

> held that the right of consenting adults (including same-sex couples) to engage in private, sexual intimacy is protected by the Fourteenth Amendment's protection of liberty, notwithstanding the historical existence of sodomy laws and their use against gay people. For the same reasons, the fundamental right to marry is "deeply rooted in this Nation's history and tradition" for purposes of constitutional protection even though same-sex couples have not historically been allowed to exercise that right. "[H]istory and tradition are the starting point but not in all cases the ending point of the substantive due process inquiry." [Lawrence, 539 U.S. at 572 (citation omitted)]. While courts use history and tradition to identify the interests that due process protects, they do not carry forward historical limitations, either traditional or arising by operation of prior law, on which Americans may exercise a right, once that right is recognized as one that due process protects.

Henry v. Himes, No. 1:14-cv-129, 2014 WL 1418395, *8 (S.D. Ohio Apr. 14, 2014) (quoting

4

Lawrence, 539 U.S. at 572); see also Kitchen v. Herbert, 961 F. Supp. 2d 1181, 1203-04 (D. Utah 2013) (affirmed 2014 WL 2868044 (10th Cir. June 25, 2014)) (discussing the role of Lawrence in the fundamental rights analysis); Obergefell v. Wymyslo, 962 F. Supp. 2d 968 (S.D. Ohio 2013), 982 n.10 (same).

**B.     State Law Must Yield To Federal Constitutional Protections.**

Defendants devote several pages to a paean to federalism. See Doc. 53 at: 4, 19–21 and 34–35. They argue that Windsor doesn't require North Dakota to treat same-sex couples equally, that North Dakota has chosen not do so, that States have virtually sole power to regulate marriage, and that States are free to selectively recognize out-of-state marriages on the basis of sexual orientation.

But, federalism does not trump the individual's constitutional rights secured by the Fourteenth Amendment against infringement by the States. See U.S. Const., Amend. XIV ("nor shall any State deprive any person of life, liberty, or property, without due process of law . . .) (emphasis added). And as the Supreme Court declared in Windsor, "[s]tate laws defining and regulating marriage, of course, must respect the constitutional rights of persons." 133 S. Ct at 2691 (citing Loving). The "virtually exclusive province" of the states to regulate domestic affairs is always "subject to those guarantees." Id. (quoting Sosna v. Iowa, 419 U.S. 393, 404 (1975)).

For this reason, "the Supreme Court has not hesitated to invalidate state laws pertaining to marriage whenever such a law intrudes on an individual's protected realm of liberty." Kitchen, 961 F. Supp. 2d, at 1198. Moreover, numerous courts addressing state marriage bans have reaffirmed the unremarkable proposition that state prerogatives are subordinate to constitutional protections. For example, in yesterday's Seventh Circuit's opinion affirming Wolf v. Walker (No. 14-2526), and Baskin v. Bogan (Nos. 14-2386 to 14-2388), Judge Posner bluntly wrote,

5

"Minorities trampled on by the democratic process have recourse to the courts; the recourse is called constitutional law." ___ F.3d ___, 2014 WL 4359059, *19 (7th Cir. Sept. 4, 2014).

Similarly, Defendants remind the Court that a 73% majority of North Dakota voters and their elected representatives enacted the statutory and constitutional bans at question in this litigation. This notion falters for the same reasons as Defendants' federalism argument. "One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections." W. Va. Bd. of Educ. v. Barnette, 319 U.S. 624, 638 (1943). Almost all of the marriage bans recently struck down by federal courts were enacted by referendum, but that did not exempt them from constitutional review. See, e.g., DeBoer v. Snyder, 973 F. Supp. 2d 757, 774 (E.D. Mich. 2014) ("The popular origin of the [Michigan marriage amendment] does nothing to insulate the provision from constitutional scrutiny.")

Whatever authority the federal system confers on States, and whatever authority the State has enacted via popular vote, they must be exercised within constitutional limits imposed by the Fourteenth Amendment.

**C.    North Dakota's Marriage Bans Interfere With Plaintiffs' Fundamental Right To Remain Married.**

Defendants' argument regarding Plaintiffs' fundamental right to remain married, Doc. 53 at 35, is little more than a recycled version of its ode to federalism. As other courts have recognized, "[t]here are a number of fundamental rights and/or liberty interests protected by the Due Process clause . . . including the right to marry [and] the right to remain married." See, e.g., Henry, 2014 WL 1418395, at *7.

It is the refusal to recognize, for state law purposes, the marriages that same-sex couples enter into and rely on in ordering their affairs before moving to North Dakota that deprives them

6

of their right to remain married in violation of due process. See e.g, id. at *9 (finding that due process protects same-sex couples' right to remain married). Plaintiffs Downey and Elmore, for example, were married in California before Downey's military transfer to North Dakota resulted in the loss of both state law legal protections and federal benefits that depend on state law definitions. Upon being transferred into the State by the federal government, the couple also lost the status and recognition marriage previously brought them. See Complaint at ¶¶ 73–82. Similarly, every day that Plaintiff Harmon drives across the Minnesota-North Dakota border and puts her life at risk protecting North Dakotans, the State of North Dakota declares her and her wife, Plaintiff Haarstick, unmarried. This impermissibly strips the couple of benefits and protections they would otherwise be entitled. See Complaint at ¶¶ 58–64.

D. **North Dakota's Marriage Bans Cannot Survive Any Level of Scrutiny.**

As Plaintiffs explained in their opening memorandum, the Supreme Court applied heighted scrutiny in its cases addressing classifications based on sexual orientation, including Windsor. The Defendants rely on pre-Windsor precedent and also argue that Windsor applied, "standard rational-basis language." Doc. 53 at 13 (citations omitted).'" Defendants go on to offer a potpourri of purported rational bases, most of which Plaintiffs have already addressed in their first memo. Plaintiffs do not repeat their briefing on why this case calls for heightened scrutiny and why none of the rationale can be considered legitimate justifications, but reply briefly to 1) point out that none of the Defendants' purported rationales have means logically connected to their purported ends, and 2) specifically discuss Defendants' argument about "proceeding with caution."

Rational basis is not a rubber stamp for discrimination. Rational basis review requires a serious analysis *of the connection* between the marriage bans and anti-recognition laws and their

7

asserted justifications. As the Supreme Court explained in Romer v. Evans, "even in the ordinary equal protection cases calling for the most deferential of standards, we insist on knowing the relation between the classification adopted and the object to be obtained." 517 U.S. 620, 632 (1996). This "search for the link between classification and objective gives substance to the Equal Protection Clause" and "provides guidance and discipline for the legislature." Id.

Courts look for a rational connection between purported legislative ends and the chosen legislative means to ensure that the state has not engaged in line drawing merely for "the purpose of disadvantaging the group burdened by the law." Romer, 517 U.S. at 633; see also Windsor, 133 S. Ct. at 2693; City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 450 (1985);; U.S. Dept. of Agriculture v. Moreno, 413 U.S. 528, 534 (1973). Laws whose purpose is to disadvantage a politically unpopular group violate equal protection. Windsor, 133 S. Ct. at 2693; Romer, 517 U.S. at 634-35; Cleburne 473 U.S., at 446-47; Moreno, 413 U.S., at 534. The history of North Dakota's marriage ban shows that it is an instance of such line drawing. See e.g., Doc. 43 at 3–4 (quoting legislative history indicating that the purpose of one of the anti-recognition laws was to "combat recognition of marriages other than between a man and woman.")

A finding that the marriage ban was motivated by an impermissible purpose is not required for this Court to find that the ban violates equal protection. See Vill. Of Willowbrook v. Olech, 528 U.S. 562, 565 (2000) (allegations of irrational discrimination "quite apart from the Village's subjective motivation, are sufficient to state a claim for relief under traditional equal protection analysis"). However, the purpose and effect of the bans was to disadvantage same-sex couples. Defendants argue that the marriage bans were intended to maintain traditional marriage laws and were not enacted on the basis of animus. But the Windsor Court addressed exactly the same circumstances, since no state allowed same-sex couples to marry in 1996 when Congress

passed DOMA. Windsor, 133 S. Ct. at 2681. However, the "history of DOMA's enactment," including a stated interest in "defend[ing] the institution of traditional heterosexual marriage," demonstrated "that interference with the equal dignity of same-sex marriages . . . was more than an incidental effect of the federal statute" but "was its essence." Id. at 2693. As Justice Scalia recognized in Lawrence, "'preserving the traditional institution of marriage' is just a kinder way of describing the State's moral disapproval of same-sex couples." 539 U.S. at 601 (Scalia, J., dissenting). As Plaintiffs showed in their opening memo and submissions, both the legislative and non-legislative proponents of the marriage ban saw it as a way to thwart any extension of marriage to same-sex couples. See Doc. 43 at 3–4.

Defendants assert that, "the People and their elected officials enacted the challenged marriage laws to protect the electorate's right to define marriage for their community," and that "the challenged laws further this purpose by ensuring that courts cannot interpret North Dakota's marriage laws to apply to same-gender couples." Doc. 53 at 16. So, the Defendants conclude, North Dakota's marriage laws cannot be motivated by animus.

Defendants misunderstand the nature of the analysis. A plaintiff need not show animus in the sense of hatred or hostility or moral disapproval, but only a purpose to disadvantage. See Bd. of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356, 374 (2001) (Kennedy, J., concurring) (an impermissible motive does not always reflect "malicious ill will"). North Dakota's marriage bans and anti-recognition laws do not have to be motivated by a particular religion or philosophy to be intended to "disadvantag[e] the group burdened by the law." Romer, 517 U.S. at 633. North Dakota's marriage bans were undoubtedly designed to exclude same-sex couples from the advantages of marriage. If they were not, Defendants would allow the Plaintiffs in this case to marry and would recognize their marriages. That is animus enough to strike down North

Dakota's marriage bans and anti-recognition laws.

### E.     *Windsor* Supports A Finding Of Improper Purpose.

Defendants recognize that the Windsor Court found that Congress intended to harm same-sex couples who would seek recognition of their relationships in marriage and that this finding was a part of the Court's analysis in striking down DOMA. Doc. 53 at 19. However, Defendants fail to grapple with the fact that the legislative history that led the Court to find Congress was motivated by "a bare ... desire to harm a politically unpopular group," Windsor, 133 S. Ct. at 2694 (citation omitted), is materially indistinguishable from the history of North Dakota's marriage bans. DOMA was enacted in response to a court decision in Hawaii recognizing the freedom to marry, while North Dakota's bans were also enacted in response to court decisions in Hawaii, Massachusetts, and other States recognizing the rights of same-sex couples. See Doc 43 at 3–4. Both exclusions were justified by appeals to tradition and fears of change. Id. The record in Windsor was sufficient to strike down DOMA's deprivation from gay and lesbian couples of the federal recognition and benefits of marriage, and the record here is likewise sufficient to strike down North Dakota's marriage bans and anti-recognition laws.

Defendants argue that Windsor's rationale does not apply to North Dakota's bans for a few main reasons. First and foremost, Defendants argue (in several different ways) that the ban forcefully reaffirmed the States' "virtual plenary" power to define and regulate marriage to protect "the man-woman marriage institution" from competing "unusual" government actions like New York recognizing marriage equality. Doc. 53 at 19. But any suggestion that Windsor was about a conflict between competing marriage traditions turns Windsor into a case about federalism, which it plainly was not. Windsor, 133 S. Ct. at 2692-93 (finding it "unnecessary to decide whether [DOMA's] federal intrusion on state power is a violation of the Constitution,

10

because it disrupts the federal balance," since DOMA "violates basic due process and equal protection principles[.]").

Defendants also appear to argue that improper motive may only be demonstrated by discriminations "of an unusual character." Doc. 53 at 20 (quoting Windsor, 133 S. Ct. at 2693). First, the "unusual character" of DOMA's regulation of domestic relations was only one piece of evidence of the law's purpose and effect to disadvantage same-sex couples. Windsor, 133 S. Ct. at 2693. The other evidence included "[t]he history of DOMA's enactment and its own text," id., as well as it "operation in practice." Id. at 2694. See also Vill. of Arlington Heights v. Metro. Housing Dev. Corp., 429 U.S. 252, 267 (1977) ("historical background of the decision" is relevant when determining legislative intent). Second, the "sheer breadth" of North Dakota's marriage bans and anti-recognition laws are "so discontinuous with the reasons offered for [them] that" the exclusion of same-sex couples is "inexplicable by anything by animus toward the class [they] affects." Romer, 517 U.S. at 632. Finally, North Dakota's marriage laws are instances of discrimination of an "unusual character" because they single out a politically unpopular group not only to bar them from marriage but also to burden their ability to seek marriage through the ordinary political process by placing the marriage and anti-recognition bans in the North Dakota Constitution. Indeed, this was one of the express purposes of the proponents of the amendment. Doc. 43 at 3–4 (outlining purpose to prevent courts or legislature from recognizing marriage for same-sex couples).

**F.     Proof Of Animus Is Not Necessary To Strike Down The Marriage Bans.**

Plaintiffs have demonstrated that the marriage bans were enacted for "the purpose of disadvantaging the group burdened by the law," Romer, 517 U.S. at 633, and that its "purpose and practical effect [is] to impose a disadvantage, a separate status, and so a stigma" on same-sex

11

couples. Windsor, 133 S. Ct. at 2693. However, as previously noted, the Court can of course conclude that the marriage ban violates equal protection without considering whether it is motivated by an impermissible purpose. See Vill. Of Willowbrook, 528 U.S. at 565. Accordingly, a finding of animus is not necessary to hold that the marriage ban lacks a rational basis. See, e.g., Kitchen, 961 F. Supp. 2d at 1215 (declining to rule on animus, but finding that Utah's marriage ban lacked a rational basis).

G.     **Proceeding With Caution Is Not Rational Basis For The Marriage Bans.**

Defendants argue that "proceed[ing] with caution" constitutes a rational basis for the marriage bans. Doc 53 at 25. Defendants paradoxically rely, again, on Justice Alito's dissent in Windsor. Yet, every court to consider the proceeding with caution argument after Windsor has rejected it, including yesterday's Seventh Circuit opinion in Wolf and Baskin. As Judge Posner wrote,

> The state's […] argument is: "go slow": maintaining the prohibition of same-sex marriage is the 'prudent, cautious approach," and the state should therefore be allowed "to act deliberately and with prudence—or, at the very least, to gather sufficient information—before transforming this cornerstone of civilization and society.' There is no suggestion that the state has any interest in gathering information, for notice the assumption in the quoted passage that the state already *knows* that allowing same-sex marriage would transform a 'cornerstone of civilization and society,' namely monogamous heterosexual marriage. One would expect the state to have provided *some* evidence, *some* reason to believe, however speculative and tenuous, that allowing same-sex marriage will or may 'transform' marriage.

___ F.3d ___, 2014 WL 4359059, *16 (7th Cir. Sept. 4, 2014) (emphasis in original).

The court in DeBoer held that "[t]he state may not shield itself with the 'wait-and-see' approach and sit idly while social science research takes its plodding and deliberative course." DeBoer, 973 F. Supp. 2d, at 772. As the Kitchen court noted, "[t]he State can plead an interest in

12

proceeding with caution in almost any setting. If the court were to accept the State's argument here, it would turn the rational basis analysis into a toothless and perfunctory review." Kitchen, 961 F. Supp. 2d, at 1213. See also Bostic v. Rainey, 970 F. Supp. 2d 456, 474-75 (E.D. Va. 2014) (rejecting opposition to "'radical change'" as a rational basis for marriage ban); Bourke v. Beshear, 2014 WL 556729, at *8 (W.D. Ky. Feb. 12, 2014) (rejecting "proceeding with caution" as a rational basis for marriage ban).

**H.     The State Confuses the Summary Judgment Standard**

While the Defendants admit that there are no disputes of material fact in this litigation, Doc. 53 at 1, they paradoxically claim that should this Court find North Dakota's marriage bans to be unsupported, that "Plaintiffs are still not entitled to summary judgment. At most Plaintiffs would have created a genuine issue of material fact, requiring discovery and a trial to resolve the factual disputes." Id. at 33-34.

Defendants misunderstand the nature of the summary judgment standard. If, as a legal matter, this Court finds North Dakota's marriage bans to be unconstitutional, because there are no disputed *material facts,* Plaintiffs are entitled to declaratory and injunctive relief. See Fed. R. Civ. P. 56.

**I.     No Stay Should Be Entered**

The consequences of North Dakota's refusal to marry and to recognize the marriages of Plaintiffs and other same-sex couples are dramatic and immediate. As demonstrated in this litigation, the marriage bans and anti-recognition laws cause real harm to families across this State every day. The families of same-sex couples in this State and District, including the couples and their children and other loved ones, deserve the protections, benefits, responsibilities, etc. that are afforded with marriage. In the event that this Court grants Plaintiffs'

motion, Plaintiffs respectfully request that no stay is entered.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant Plaintiffs motion for summary judgment.

*Dated this 5th day of September, 2014.*


**MADIA LAW LLC**

/s/Joshua A. Newville            .
Joshua A. Newville
Admitted *pro hac vice*
345 Union Plaza
333 Washington Avenue North
Minneapolis, Minnesota 55401
Phone: (612) 349-2743
Fax: (612) 235-3357
joshuanewville@madialaw.com
**ATTORNEY FOR PLAINTIFFS**